[Civ. No. 40425. First Dist., Div. Four. Mar. 31, 1980.]

GUILD WINERIES AND DISTILLERIES,
Plaintiff and Appellant, v.
LAND DYNAMICS, Defendant and Respondent.

COUNSEL

Godfrey L. Munter, Jr., Robert W. Martin, Gary T. Day, Martin, Munter & Keegin, Martin & Munter and Duane W. Dresser for Plaintiff and Appellant.

Crossland, Crossland, Caswell & Bell, Caswell, Bell & Sullivan and James M. Bell for Defendant and Respondent.

OPINION

**CHRISTIAN, J.**—Guild Wineries and Distilleries appeals from a judgment for respondent Land Dynamics in this action brought by appellant to enforce respondent's obligations as the surety on a continuing guaranty.

In November 1972, appellant granted to respondent an option to purchase for $875,000 a business entity called the Kingsburg Winery, comprising real and personal property. The option was assignable, but the agreement provided that upon assignment respondent would become liable under a continuing guaranty, in favor of appellant, of the assignee's performance.

Early in 1973 respondent, with appellant's consent, assigned its rights as optionee to Lamb-Weston, a division of AMFAC Corporation. Lamb-Weston was required by law to obtain a winegrower's license from the Department of Alcoholic Beverage Control before it could operate the Kingsburg Winery; but another division of AMFAC already held a retail license, and at that time one entity could not lawfully hold

both a winegrowing and a retail license. (Bus. & Prof. Code, § 25500 et seq.) Appellant, with knowledge of this disability, sold the winery to Lamb-Weston. Part of the purchase price was reflected by a $725,000 promissory note executed by Lamb-Weston. The note was secured by a general chattel mortgage and security agreement, and a deed of trust.

Respondent executed a continuing guaranty, undertaking to be a surety of Lamb-Weston's promissory note. Respondent also agreed that if Lamb-Weston was unable to obtain a winegrower's license, respondent would acquire the winery from Lamb-Weston. Lamb-Weston was unable to obtain the license and exercised its right to have respondent purchase the winery. Respondent gave Lamb-Weston a promissory note for $160,000, and the transfer was completed.

It is disputed whether appellant's written consent was required before the winery could be transferred from Lamb-Weston to respondent, and the evidence is in conflict as to whether consent in any form was ever given. Robert Hillison, who was respondent's general counsel at that time, testified that he was "acting on behalf of [respondent] in connection with the transaction"; and that he did not consult with appellant about the sale prior to the sale. Margaret Shahenian, vice president of appellant, testified that appellant's consent was neither requested nor given. Respondent introduced evidence that eight days after the close of the transfer from Lamb-Weston to respondent appellant's books recognized respondent, and not Lamb-Weston, as the obligor on the Lamb-Weston $725,000 promissory note. The trial court did not make a finding of fact on this issue; however, in its conclusions of law, the court determined that appellant had "consented" to the sale of the winery by Lamb-Weston to respondent.

On October 31, 1973, respondent sold the winery property to Almaden Vineyards for $1.3 million, including $575,000 cash. Again, there is dispute concerning appellant's consent to the sale. On September 20, Almaden sent the following telegram to respondent offering to purchase the winery: "OUR FINAL OFFER FOR THE KINGSBURG WINERY WILL BE 1,300,000 DOLLARS SUBJECT TO BOARD APPROVAL. OTHER GENERAL CONDITIONS AS FOLLOWS 1. CASH TO EXISTING MORTGAGE WITH ASSUMPTION OF SALE 2. IMMEDIATE POSSESSION AND CLOSING WITHIN 30 DAYS OF BOARD APPROVAL 3. GRAPE PURCHASE AGREEMENT FOR APPROXIMATELY 920 ACRES. ALMADEN'S BOARD MEETS FRIDAY SEPTEMBER 21. IF OFFER ACCEPTABLE, WILL HAVE CONFIRMATION BY MONDAY SEPTEMBER 24."

Hillison, respondent's attorney, testified that respondent orally accepted Almaden's offer prior to October 5. On October 5, Hillison made a "courtesy" phone call to Stafford Keegin, one of appellant's attorneys, and advised him of the intended sale of the winery to Almaden. Hillison further testified that he asked Keegin if he "saw any problems" with the sale, that Keegin told him about some unpaid insurance premiums, and that Keegin did not raise any objections to the sale. Hillison did not think that appellant's consent was required, did not inform appellant of the terms of the sale because he did not believe that it was entitled to that information, and never requested appellant's consent to the sale.

Escrow instructions for the sale of the winery were signed by Almaden and respondent on October 10. About that time, the escrow holder mailed a request for a beneficiary statement to appellant's attorneys. This request was received before October 23, but was never responded to.

By the time of trial Almaden had made all scheduled payments on the Lamb-Weston $725,000 promissory note, so that the unpaid balance on the note stood at $507,500, claimed by appellant to be due.

The principal value of the winery property lies in redwood cooperage (wine storage casks) forming part of the collateral securing the promissory note. The vice president and treasurer of Almaden testified that since acquiring the property Almaden has invested $425,000 in improving the cooperage, and another $390,000 on the buildings in which it is housed. Another $424,000 was budgeted to be spent on the buildings and cooperage in 1976. According to this witness the cooperage was worth about $1.3 million at the time Almaden bought it from respondent, and by the time it completes its improvement work the cooperage will be worth about $3 million. The net worth of Almaden at the time of trial was about $53 million. Finally, appellant's vice president and secretary testified that to her personal knowledge the security interest of appellant had not been diminished by the transfer from Lamb-Weston to respondent, or from respondent to Almaden.

Appellant first made known its demand for acceleration of the debt, and for the proceeds from the two sales of the winery, as additional security, in a letter dated October 23, 1973, from its attorneys to the attorneys of both Almaden and respondent.

Appellant contends that there have been defaults under the general chattel mortgage and the security agreement, which were executed by Lamb-Weston in connection with its purchase of the winery, and that these constitute defaults on the Lamb-Weston promissory note, which have therefore caused respondent to become liable on its continuing guaranty. Under the terms of the introductory paragraph of the general chattel mortgage and security agreement, appellant was given "a security interest in (a) all collateral [and] (b) the proceeds...of such collateral...and any property which [Lamb-Weston] may receive on account of such collateral which [Lamb-Weston] will immediately deliver to [appellant]." Lamb-Weston specifically warranted, in paragraph 2 of the agreement, that, "unless specifically otherwise agreed by [appellant] in writing," it would "(e) Not sell...or transfer Collateral...until the Debt has been paid, even though [appellant] has a security interest in proceeds of such Collateral." Defaults are defined in paragraph 10 to include "(a) [Lamb-Weston's] failure to pay or perform this or any agreement with [appellant] or breach of any warranty herein." Finally, the parties agreed in paragraph 9 that "On [Lamb-Weston's] default, at [appellant's] option, without demand or notice, all or any part of the Debt shall immediately become due." Thus under the agreement a default occurred when the collateral was transferred without appellant's written consent, and the proceeds from the sale of the collateral were not immediately delivered to appellant. Lamb-Weston was in default on the note when it transferred the collateral to respondent without appellant's written consent and when it failed to deliver the proceeds of the sale to appellant. Lamb-Weston came under additional liability, as a surety, when its assignee (respondent) subsequently transferred the collateral to Almaden without having obtained appellant's consent and without remitting the proceeds of the sale to appellant to reduce the debt owed by appellant. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 746, p. 624.)

Respondent's liability to appellant because of Lamb-Weston's defaults is based on its continuing guaranty executed in favor of appellant. The instrument provides a continuing guaranty of "any and all indebtedness of Lamb-Weston." The contrary statement in the trial court's conclusion of law number 4 is unsupported by the record.

The provisions of Civil Code sections 2845 and 2849, requiring a creditor to proceed against the principal debtor or pursue other remedies (e.g., exhausting mortgaged property) prior to claiming against a

guarantor, may be waived by a guarantor. (*Engelman* v. *Bookasta* (1968) 264 Cal.App.2d 915 [71 Cal.Rptr. 120].) The continuing guarantee waives those statutory requirements:

"3.  The obligations hereunder are joint and several, and independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or whether Borrower be joined in any such action or actions; . . .

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"5.  Guarantor waives any right to require [appellant] to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in [appellant's] power whatsoever . . . ."

Respondent's liability for the default resulting from the transfer to Almaden is also supported by section 9201, California Uniform Commercial Code: "Except as otherwise provided by this code a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors."[1] Thus, the security agreement executed by Lamb-Weston is binding on respondent as a purchaser of the collateral.

Appellant's right to receive immediately the proceeds of a sale of the collateral, as set forth in the introductory paragraph of the security agreement (*ante*), is supported by California Uniform Commercial Code section 9306.[2] Respondent has not disputed, and documentary evidence demonstrates, that appellant's security interest in proceeds remained perfected by virtue of the financing statement which had been filed with the Secretary of State on March 23, 1973, and which expressly covered proceeds in accordance with section 9306, subdivision (3)(a). Since this security interest remained continuously perfected it binds all subsequent holders of the collateral, including respondent.

---

[1]For text governing this cause see Statutes 1963, chapter 819.

[2]Section 9306 of the Commercial Code (Stats. 1963, ch. 819) provided in pertinent part: "(1) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.'

"(2) Except where this division otherwise provides, a security interest continues in

The trial court made the following finding of fact: "24. The Chattel Mortgage and Security Agreement...contained a covenant against assignment without permission of [appellant]; however, none of the other documents entered into by and between [appellant] and Lamb-Weston, including the promissory note...and the Deed of Trust and Assignment of Rents...contained a 'due on sale,' 'acceleration,' or 'covenant against transfer or assignment' provision." But it is irrelevant that there is no acceleration or due-on-sale clause in the promissory note or deed of trust; these documents, along with the general chattel mortgage and security agreement, are parts of one integrated contract. The last sentences of the general chattel mortgage provide: "This agreement contains the entire security agreement between [appellant] and [Lamb-Weston]. [Lamb-Weston] will execute any additional agreements, assignments, or documents reasonably required by [appellant] to effectuate this agreement."

No other "debt," besides that which is represented by the Lamb-Weston promissory note, has been suggested by respondent as the one which is referred to by the acceleration clause in the general chattel mortgage. Indeed, the note is entitled, "Note Secured by Deed of Trust and General Chattel Mortgage and Security Agreement." Finally, the guaranty executed by respondent "authorizes" appellant to "accelerate" the guaranteed debt.

The trial court made the following conclusion of law: "1. The Court interprets the contract documents which are at issue in this case, to wit, promissory note, deed of trust, general chattel mortgage and security agreement and continuing guaranty, to mean that a separate sale of the cooperage at the Kingsburg Winery was forbidden without [appellant's] consent, but that a complete sale of the Kingsburg Winery, as in this

---

collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless

"(a) A filed financing statement covering the original collateral also covers proceeds; or

"(b) The security interest in the proceeds is perfected before the expiration of the 10-day period."

case, from Lamb-Weston to [respondent] and from [respondent] to Almaden, was not forbidden and any such sale or sales would not activate the covenant against assignments as contained in the general chattel mortgage and security agreement, nor would such sale or sales cause any liability under any of the documents, including but not limited to the continuing guaranty."

There is no support in the documents comprising the contract for the conclusion that the agreement merely placed a due-on-sale restraint on the separate sale of the cooperage without a sale of the realty. If it has any significance at all, the absence of due-on-sale clauses in the deed of trust and note implies only that the realty could be sold separately, without actuating the acceleration clause, as long as the cooperage was retained. But in fact the cooperage was not retained.

■ As an alternative ground of decision, the trial court recited in its conclusions of law that "The general chattel mortgage and security agreement, to the extent that it would preclude a transfer of the Kingsburg Winery to a qualified buyer without a diminution of the value of the collateral, constitutes an unreasonable restraint on alienation." (See Civ. Code, § 711.) The assets dealt with by the parties included both realty and personalty. But the primary value of the business entity was in the personalty (specifically, the cooperage). We have seen that the general chattel mortgage and security agreement includes a due-on-sale clause, while the deed of trust on the real property does not. Appellant claims that it is enforcing the due-on-sale clause with respect to the personal property. Applying California Uniform Commercial Code section 9501,[3] the Supreme Court has held that a creditor who has both real and personal property security can elect to proceed solely as to the personal property, in which case personal property law will be applied. (*Walker* v. *Community Bank* (1974) 10 Cal.3d 729, 735 [111 Cal.Rptr. 897, 518 P.2d 329].) While there was no evidence introduced at trial concerning the apportionment of the value of the winery between personalty and realty, the fact that the predominant value of the security interest is in the personalty must be accorded some weight in determining the validity of the operation in this case of the due-on-sale clause.

---

[3]California Uniform Commercial Code section 9501 provides in pertinent part: "(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this chapter and except as limited by subdivision (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to

In *Tucker* v. *Lassen Sav. & Loan Assn.* (1974) 12 Cal.3d 629 [116 Cal.Rptr. 633, 526 P.2d 1169], the Supreme Court, applying Civil Code section 711, held: "[A] 'due-on' clause contained in a promissory note or deed of trust is not to be enforced simply because the trustor-obligor enters into an installment land contract for the sale of the security. Rather, in such a case the clause can be validly enforced only when the beneficiary-obligee can demonstrate a threat to one of his legitimate interests sufficient to justify the restraint on alienation inherent in its enforcement. Such legitimate interests include not only that of preserving the security from waste or depreciation but also that of guarding against what has been termed the 'moral risks' of having to resort to the security upon default." (*Id.*, pp. 638-639.) *Tucker* adopted the following test in determining whether a restraint on alienation is unreasonable and therefore void: "To the degree that enforcement of the clause would result in an increased quantum of actual restraint on alienation in the particular case, a greater justification for such enforcement from the standpoint of the lender's legitimate interests will be required in order to warrant enforcement." (*Id.*, p. 636; see Comment (1976) 64 Cal.L. Rev. 573.)

Elaborating on *Tucker* the California Supreme Court has held that "a due-on clause contained in a promissory note or deed of trust cannot be enforced upon the occurrence of an outright sale unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default." (*Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953 [148 Cal.Rptr. 379, 582 P.2d 970].) The court limited its holding to cases involving institutional lenders, expressing "no present opinion on the question whether a private lender...has interests which might inherently justify automatic enforcement of a due-on clause...upon resale." (21 Cal.3d at p. 952, fn. 9; see Comments (1979) 31 Hastings L.J. 275, 13 U.S.F. L.Rev. 639.) Because the affected property in *Wellenkamp* was realty, the court did not discuss possible extension of the new rule to chattels subjected to a security interest. Here no institutional lender is involved, and

---

the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in Section 9207. The rights and remedies referred to in this subdivision are cumulative.

"(4) If the security agreement covers both real and personal property, the secured party may proceed under this chapter as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of this chapter do not apply."

the major asset securing the obligation is personal property. It would therefore be possible for this court to reach in the present appeal the question whether automatic enforcement of a due-on clause is to be withheld from a noninstitutional lender whose security interest attaches to chattels rather than to realty. But we do not consider it necessary or appropriate to reach that question. Here two circumstances establish that in fact there was no unreasonable restraint on alienation. First, by virtue of the outright sale to Almaden, respondent received $575,000 in cash as against an accelerated debt of $725,000. There is no claim (cf. *Tucker, supra*, 12 Cal.3d at p. 633) that respondent could not raise the $150,000 balance of the accelerated debt. Second, the wine cooperage which is the major asset securing the debt is in its nature subject to removal and to deterioration if it is misused or neglected. Where there is no evidence of an actual restraint on alienation and uncontradicted evidence of a reasonable interest in connecting acceleration of the debt to sale of the principal asset securing payment of the debt, extension of the *Wellenkamp* rule could not affect the result. We conclude that the evidence and the findings do not support the determination of the trial court that enforcement of the due-on clause is an unreasonable restraint on alienation.

■ Appellant contends that it did not consent to either of the two transfers of the collateral; that it did not waive its rights under the contract to require its written consent, or to demand the proceeds from the transfers or the acceleration of the debt; and that it is not estopped to deny that it gave its consent or waived any of its rights. The two transfers must be analyzed separately. The trial court's conclusions that appellant consented to the sale of the winery from Lamb-Weston to respondent, and that it waived its rights to require its written consent or to demand the proceeds from the sale, are supported by substantial evidence. "Waiver is the intentional relinquishment of a *known right*." (7 Witkin, Summary of Cal. Law (8th ed. 1973) Equity, § 133, p. 5353.) It may be either express or implied. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 593, p. 507.) Appellant's consent to the transfer, and its waiver of its contractual rights to claim a default as a consequence of the transfer, are evidenced by the following facts: (1) At the time it sold the winery to Lamb-Weston, appellant knew that Lamb-Weston might not be able to obtain a license to operate the winery and would therefore have to sell it; (2) appellant demanded and accepted respondent as guarantor of Lamb-Weston's obligations; (3) appellant did not demand the delivery of the proceeds from that sale

until more than three months later when respondent transferred the winery to Almaden; and (4) eight days after the transfer, appellant's books recognized respondent, and not Lamb-Weston, as the obligor on the Lamb-Weston promissory note.

Furthermore, there is substantial evidence supporting the court's determination that appellant is estopped to deny its consent or waiver. Evidence Code section 623 defines estoppel as follows: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." A necessary element of estoppel is that the party to whom the representation is made must reasonably rely on the representation. (7 Witkin, Summary of Cal. Law, *supra*, Equity, § 132, pp. 5351-5352.) There was evidence that respondent relied on appellant's consent and waiver, in proceeding with the transfer from Lamb-Weston.

■ But appellant is not estopped to claim that a default occurred as a result of the transfer from respondent to Almaden. As to that transfer, the necessary element of reasonable reliance on the part of respondent is missing. There was uncontradicted evidence that respondent did not believe that appellant's consent to the transfer was required, that respondent did not inform appellant of the terms of the sale because it did not believe that it was entitled to that information, and that respondent never requested appellant's consent to the sale. Moreover, appellant never represented to respondent that it consented to the sale, or waived any of its rights under the contract. In a letter dated October 23, 1973, appellant informed respondent that it would only consent to the transfer if the proceeds from the sale were delivered to appellant. Appellant also acted without delay in filing suit to enforce its rights.

Appellant points out that, under the continuing guarantee signed by respondent, appellant is entitled to an award of reasonable attorney's fees in the event that it is successful in this action. Paragraph 8 of the continuing guaranty agreement provides that: "Guarantor [Land Dynamics] agrees to pay a reasonable attorney's fee and all other costs and expenses which may be incurred by Guild in the enforcement of this guaranty."

A provision in a contract for payment of reasonable attorney's fees in the event of suit to enforce the contract is valid. (*Nevin* v. *Salk* (1975) 45 Cal.App.3d 331, 338 [119 Cal.Rptr. 370]; *Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 832, 836 [101 Cal.Rptr. 4]; *Malibou Lake Mountain Club, Ltd.* v. *Smith* (1971) 18 Cal.App.3d 31, 35 [95 Cal.Rptr. 553]; *Wiener* v. *Van Winkle* (1969) 273 Cal.App.2d 774, 784 [78 Cal.Rptr. 761]; *Heidt* v. *Miller Heating & Air Conditioning Co.* (1969) 271 Cal.App.2d 135, 137, 138 [74 Cal.Rptr. 695]; see 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, §§ 119-121, pp. 3270-3273.) Appellant is therefore entitled to its reasonable attorney's fees under the contract provision, to be fixed by the trial court if appellant prevails.

The judgment is reversed.

Caldecott, P. J., and Rattigan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 28, 1980. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.