**Richard L. COX, Plaintiff,**

v.

**RESILIENT FLOORING DIVISION OF CONGOLEUM CORPORATION, a corporation, also known as Congoleum Corporation, a corporation, also known as Congoleum-Narin, Defendant.**

No. CV84–6951–JSL(JRx).

United States District Court, C.D. California.

June 13, 1986.

Steve Roseman, Los Angeles, Cal., for plaintiff.

Frank Cronin and Louis F. Gutierrez, Jackson, Lewis, Schnitzler & Krupman, Los Angeles, Cal., for defendant.

## ORDER ON JOINT MOTION FOR RE-CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT

LETTS, District Judge.

The parties have filed a joint motion for reconsideration of defendant's motion for

summary judgment. Having considered in detail all of the materials presented in connection with the motion,[1] the Court is of the opinion that the motion for summary judgment should be granted as to all causes of action.

This case is the first of four wrongful discharge cases to be decided together by the Court. These cases were taken under submission in an effort to determine whether there may be a consistent thread woven among the rapidly proliferating California decisions in the area which, if identified and enunciated, would provide a greater degree of predictability for employers and employees, both in planning their conduct and in determining whether particular lawsuits should be filed and pursued. The Court believes that such a thread does exist in the California decisions, and has attempted to articulate it in the alternative grounds of its decision here. Mindful of the duty of federal courts to follow rather than to lead state law in diversity cases, however, the Court has first analyzed the case in conventional terms.

## 1. PROCEDURAL HISTORY

This action arises out of the termination of Plaintiff Richard L. Cox's employment as a regional sales manager with Defendant Congoleum Corp. ("Congoleum"). It is a diversity case governed by the substantive law of California. The complaint originally alleged five causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) intentional infliction of emotional distress; (4) intentional misrepresentation; and (5) negligent misrepresentation. Plaintiff has abandoned his claims for intentional infliction of emotional distress and negligent misrepresentation.

Congoleum's initial motion for summary judgment on all causes of action was denied by Judge Waters.[2] Subsequently, on Congoleum's motion for reconsideration, Judge Waters vacated his previous order and granted summary judgment on Cox's claims for breach of contract and breach of the covenant of good faith and fair dealing (the "wrongful discharge" claims). He denied the motion with respect to the intentional misrepresentation claim.[3]

After the case was reassigned here, the parties moved for reconsideration of the summary judgment motion. Congoleum asserts that the failure to grant summary judgment on the misrepresentation claim is fatally inconsistent with the Court's ruling on the wrongful discharge claims. Congoleum seeks summary judgment against Cox

---

**1.** Specifically, the Court has reviewed the following documents and related materials: (1) Defendant's Notice of Motion and Motion for Summary Judgment; (2) Defendant's Memorandum of Points and Authorities in Support of the Motion for Summary Judgment; (3) Defendant's Evidentiary Materials in Support of the Motion for Summary Judgment; (4) Defendant's Statement of Uncontroverted Facts and Conclusions of Law; (5) Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment; (6) Plaintiff's Evidentiary Materials in Support of the Opposition; (7) Plaintiff's Statement of Genuine Issues; (8) Defendant's Reply to Plaintiff's Opposition; (9) the Order denying the Motion for Summary Judgment; (10) Defendant's Notice of Motion and Motion for Reconsideration; (11) Defendant's Memorandum in Support of Motion for Reconsideration; (12) Plaintiff's Memorandum in Opposition to Motion for Reconsideration; (13) Defendant's Reply to Plaintiff's Opposition to Motion for Reconsideration; (14) the Order Vacating Previous Order Denying Summary Judgment and Entering Summary Judgment; (15) Notice of Joint Motion and Joint Motion for Reconsideration; (16) Defendant's Memorandum of Points and Authorities in Support of Joint Motion for Reconsideration; and (17) Plaintiff's Supplemental Points and Authorities in Opposition to the Motion for Summary Judgment.

**2.** In his original ruling, Judge Waters found that there were genuine issues of material fact with respect to whether Cox's employment contract was an invalid adhesion contract under California law; that the contract did not provide for employment at will but instead contained only notice provisions; and that there were remaining issues of fact with regard to whether Congoleum had violated its policies and procedures.

**3.** In the new order, Judge Waters found that Cox was foreclosed by the terms of his employment contract from arguing that his employment was other than at will. The Court concluded that "[t]his ruling leaves plaintiff with only a claim for intentional misrepresentation."

on all causes of action. Although Cox contends that the two rulings are compatible, he argues primarily that the motion for summary judgment should be denied in its entirety. The Court has concluded that the wrongful discharge claims cannot survive summary judgment, and that the misrepresentation claim must fall as well.

## II. FACTS

The relevant facts are largely undisputed. Where there is a disagreement about material facts, the evidence has been construed and inferences drawn in favor of the nonmoving party. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

Congoleum manufactures resilient vinyl flooring. It markets its products exclusively through independent wholesale distributors. Cox was first employed by Congoleum in 1957 as a salesman in northern California. In 1962, he became Assistant District Manager in the Chicago area. In 1964, he was transferred to Philadelphia and promoted to District Sales Manager. He was transferred and promoted again to the position of District Sales Manager of the larger district of Los Angeles in 1969. In 1982, he was promoted to the position of Western Regional Sales Manager. As Western Regional Sales Manager, Cox was responsible for Congoleum's overall sales and marketing efforts in the western United States.

In 1984, after more than two years as Western Regional Sales Manager, Cox's employment was terminated. The formal notice of termination stated only: "Reduction in Force. Position Eliminated." Fifteen other Congoleum sales employees were terminated at the same time as Cox. Congoleum treated all fifteen terminations as part of a single reduction in force. In accordance with established corporate procedures, Cox was given 27 weeks severance pay and two additional weeks pay in lieu of notice. Upon receiving notice of his termination, Cox requested that Congoleum place him in another position with the company. He offered to accept any of several lesser positions, including district sales manager or salesman. Cox was told that he would not be considered for any other position. He received no counseling of any kind, and was not given the formal "exit interview" to which he claims to have been entitled.

During Cox's term as Western Regional Sales Manager, Congoleum received a number of complaints about Cox from Congoleum distributors with whom Cox had business dealings. The gist of the complaints was that Cox's attitude toward some personnel of these distributors was abrasive, inflexible and sometimes condescending, and that his attitude was detrimental to business relations.

During the course of Cox's employment, he and Congoleum entered into three separate written employment agreements. The first agreement was executed at or about the time of Cox's initial hiring. The second and third agreements were executed at or about the time Cox accepted transfers and promotions to District Sales Manager for Philadelphia and Los Angeles, respectively. Each of the employment agreements contained substantially the following provision:

> It is understood that my employment shall being on _____, or shall continue, and may be terminated by either the Company or myself upon not less than fifteen days' advance notice, unless I shall have been employed for less than six months, in which event my employment may be terminated by either the Company or myself upon five days' advance notice. In the event of such notice of termination by the Company or me, I shall remain in the active employment of the Company for all or any part of the notice period, if so requested by the Company, but the Company reserves the right to pay me my salary for or during the notice period and to terminate the employment immediately or at any time during the notice period. This employment shall comprise such duties as the Company may direct, and if I, at any time, refuse or neglect to perform my

duties to the Company's reasonable satisfaction or violate any agreement or regulation, the Company may terminate my employment without any notice period.

The Court assumes that during Cox's successive tenures as salesman, Philadelphia District Sales Manager, and Los Angeles District Sales Manager, he received no significant criticism from anyone within Congoleum about his performance. Indeed, during that period he received numerous commendations. Cox's immediate superiors and other officials assured him that he was a "highly valued employee," and that Congoleum's policy was to "reward long-term employees" and "to provide them with the assurance of steady employment." For purposes of this opinion, it is assumed that responsible company officials represented to Cox that he was guaranteed continued employment until his retirement, subject only to termination for good cause.

The Court also accepts as true the doubtful proposition that Cox was familiar with and relied upon Congoleum's written policies regarding long-term employees. The Court accepts as true Cox's assertion that the purport of Congoleum's policies with respect to the treatment of long-term employees whose positions were to be eliminated through reductions in force was to offer transfer or reassignment, where practical, as an alternative to outright severance. The Court also accepts as true that absent a reduction in force, a long-term Congoleum employee who was to be terminated for cause would be entitled to more personal counseling, and additional internal corrective procedures, than Cox was afforded.

## III. ANALYSIS

### A. *Independent tort analysis, as urged by Cox, is inappropriate.*

Conventional analysis of California employment law begins with reference to Cal. Labor Code section 2922, which provides:

An employment, having no specified term, may be terminated at the will of either party on notice to the other....
Employment for a specified term means an employment for a period greater than one month.

This statute appears on its face to be a sweeping endorsement of the idea that employers are free to terminate employees with or without cause for any reason, arbitrary or not. In practice, however, California courts have limited application of the statute in a number of ways. As the court in *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal.App.3d 467, 475–76, 199 Cal. Rptr. 613 (1984), explained, at least

[t]hree distinct theories have been developed: (1) a tort cause of action for wrongful discharge in violation of public policy (*Tameny v. Atlantic Richfield Co.*, [27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980)]); (2) a cause of action for employer's breach of the implied covenant of good faith and fair dealing, which sounds both in tort and contract (*Cleary v. American Airlines, Inc.*, [111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980)]); and (3) a cause of action for employer's breach of an implied-in-fact covenant to terminate only for good cause (*Pugh v. See's Candies, Inc.*, [116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981)]).

Cox argues that Congoleum's actions constituted a breach of an implied-in-fact promise to terminate only for cause, which arose from oral representations made to him by Congoleum officials. For this cause of action he relies on a line of cases of which *Pugh* is the prime exemplar. Cox also urges that Congoleum breached the implied covenant of good faith and fair dealing by its failure to accord him the benefit of corporate policies designed to assure treatment of "like cases alike," relying on a line of cases of which *Cleary* is the prime exemplar.

Congoleum responds that because these contentions are founded in contract, they are foreclosed by the express terms of the written employment agreements. As previously noted, Judge Waters adopted this position in granting summary judgment on the wrongful discharge claims. In so holding, Judge Waters also necessarily rejected

Cox's contention that the employment agreements were unenforceable contracts of adhesion under California law.

Cox's arguments in this reconsideration motion essentially seek to have this Court hold that facts which do not give rise to contractual liability may nonetheless form the basis for liability in tort. Judge Waters' short opinion gives no hint of his view of this contention, which this Court rejects. To hold for Cox on this basis, the Court would be required to accept the notion that it is legally possible under tort law for one contracting party to defraud the other into believing the contract contains terms which it does not. Because contract law itself provides that on such facts the contract may be reformed to comport with the "defrauded" party's understanding, that law itself cures the tort. *See* Cal.Civ.Code section 3399; *see also Anderson v. Yousem*, 177 Cal.App.2d 135, 143–44, 1 Cal.Rptr. 889 (1960); *Tomas v. Vaughn*, 63 Cal.App.2d 188, 195, 146 P.2d 499 (1944). Independent tort analysis simply need not come into play. Similarly, while one party may be induced to rely on representations that particular contractual provisions will not be enforced, the contractual concepts of waiver and estoppel cure the wrong. *See, e.g.,* Cal.Evid.Code section 623 ("Whenever a party has, by his own statement ... deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement ..., permitted to contradict it."); *City of Long Beach v. Mansell*, 3 Cal.3d 462, 488, 91 Cal.Rptr. 23, 476 P.2d 423 (1970) (equitable estoppel means that one who has caused another to rely on his words or actions "shall not

subject such person to loss or injury by disappointing the expectations upon which he acted"); *Guild Wineries & Distilleries v. Land Dynamics*, 103 Cal.App.3d 966, 977, 163 Cal.Rptr. 348 (1980) (finding that one party waived its rights under a written contract, defining waiver as "the intentional relinquishment of a known right"). These principles, rather than tort concepts, provide the proper analytical framework.

B. *Congoleum did not breach an implied-in-fact promise to terminate Cox only for good cause.*

For purposes of this opinion, the Court assumes, based on the line of cases beginning with *Pugh*, that certain oral representations made to Cox, together with the longevity of his employment and the company's written policies regarding the treatment of long term employees, produced an implied-in-fact promise that he could not be terminated without good cause.[4]

Reduction in force has been held to constitute good cause under the *Pugh* standard. *Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391, 1395 (9th Cir. 1985); *Clutterham v. Coachmen Industries, Inc.*, 169 Cal.App.3d 1223, 1227, 215 Cal.Rptr. 795 (1985). Cox does not dispute that there was a legitimate reduction in force. He admits also that his job was eliminated and has not been filled. He argues instead that the reduction in force was not the "real" reason for his termination, and that he was included in the reduction in force only because his superiors wanted independently to terminate him.

---

4. As with the question of the validity of the employment agreements, this issue need not be decided in light of the Court's holding *ante* that the termination was not wrongful if viewed as a termination for cause. The Court notes, however, that Cox's arguments on this issue appear to be inconsistent with the controlling cases, which stand for the proposition that there cannot be contrary express and implied contracts on the same subject. *See Gianaculas v. Trans World Airlines, Inc.,* 761 F.2d 1391, 1394 (9th Cir.1985); *Shapiro v. Wells Fargo Realty Advisors,* 152 Cal.App.3d 467, 482, 199 Cal.Rptr. 613, 622 (1984). Furthermore, there is California authority to the effect that an oral promise for permanent employment is barred by the statute of frauds. *See, e.g., Foley v. Interactive Data Corp.,* 174 Cal.App.3d 282, 289–90, 219 Cal.Rptr. 866 (1985), *review granted* Jan. 27, 1986; *Santa Monica Hospital v. Superior Court,* 172 Cal. App.3d 698, 703, 218 Cal.Rptr. 543, *modified,* 173 Cal.App.3d 348d, 218 Cal.Rptr. 543 (1985), *review granted* Jan. 13, 1986; *Newfield v. Insurance Co. of the West,* 156 Cal.App.3d 440, 446–47, 203 Cal.Rptr. 9 (1984).

This argument takes Cox nowhere. With respect to his job performance, Cox has not denied that complaints were lodged against him by representatives of Congoleum distributors. One could not fairly evaluate his performance if these complaints were ignored. The Court concludes under the *Pugh* standard that there was good cause for Cox's termination.

Judge Grodin, writing in *Pugh,* recognized that he was venturing into dangerous waters by adopting a rule which would require judicial examination of whether good cause existed for an employee's termination. He made clear that if courts address such a question at all, they must not use too strict a standard in reviewing corporate decisions to terminate. Specifically, recognizing that the terms "just cause" and "good cause" are vague by nature, Judge Grodin wrote:

> The terms "just cause" and "good cause," "as used in a variety of contexts ... have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case." (*R.J. Cardinal Co. v. Ritchie,* [218 Cal.App.2d 124, 144, 32 Cal. Rptr. 545 (1963)].) Essentially, they connote "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." (*[Id.* at 145, 32 Cal.Rptr. 545].) Care must be taken, however, not to interfere with the legitimate exercise of managerial discretion. "Good cause" in this context is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (*Cf.* Lab.Code, section 2924.) And where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment.

116 Cal.App.3d at 330, 171 Cal.Rptr. 917. Elsewhere in the opinion, Judge Grodin provided additional insight as to his views by saying, "[i]ndeed, it seems difficult to defend termination of such a long-time employee arbitrarily, i.e., without *some* legitimate reason, as compatible with either good faith or fair dealing." *Id.* at 328, 171 Cal.Rptr. 917 (emphasis in original).

Cox asks this Court to submit to a jury not only the question whether Congoleum's decision to include him in the reduction of force was the "real reason" for his termination, but also, if it was not, whether the decision to terminate him for other cause would have been "correct"—that is, whether the acknowledged complaints about Cox lodged by others represented "good cause." Any trial on these questions, however, would embroil the Court in just the sort of inquiries against which the *Pugh* court warned. Cox is entitled to have neither this Court nor a jury second-guess Congoleum on these facts.

C. *Congoleum did not breach the covenant of good faith and fair dealing.*

In arguing that he was terminated in violation of the covenant of good faith and fair dealing implied in his employment contract, Cox asserts that he was not afforded the benefit of corporate procedures adopted for the protection of similarly-situated employees. For this he relies upon a line of California cases beginning with *Cleary,* 111 Cal.App.3d 443. The Court agrees with Cox, for purposes of this opinion, that these cases establish the following principles:

(1) that every California employment relationship is founded in contract;

(2) that implicit in every California employment relationship is an implied covenant of good faith and fair dealing, *Cleary, id.* at 453, 168 Cal.Rptr. 722; and

(3) that the implied covenant of good faith and fair dealing entitles every employee at a minimum to the benefit of the fair application of general rules adopted for the protection of all employees, *see Rulon-Miller v. International Business Machines Corp.,* 162 Cal.App.3d 241, 248, 208 Cal.Rptr. 524 (1984); *Cleary,* 111 Cal. App.3d at 455–56, 168 Cal.Rptr. 722 (longevity plus company rules); *but see Gianaculas,* 761 F.2d at 1394–95 (longevity plus company procedures preclude discharge

without good cause, but procedures themselves do not become standards of good faith and fair dealing).

■ As previously noted, Cox does not contend that there was not a valid reduction in force. This proves fatal to his argument that he was entitled to the benefits of Congoleum's procedures with respect to terminations for substandard performance. Cox has neither made nor offered any showing that Congoleum's purpose for including him in the reduction in force was to avoid having to go through these procedures. Although his inclusion in the reduction in force may have made unnecessary a determination that he should be terminated for poor performance and may therefore have mooted some procedures which might otherwise have been applicable, the fact that Congoleum had two valid reasons for termination can hardly provide a basis for holding that Congoleum could not terminate Cox at all.[5]

■ This also disposes of Cox's contention that he was entitled to counseling prior to his termination. Congoleum's counseling policy plainly was written to speak to situations in which employees are subject to "disciplinary" action. The undisputed evidence shows that prior to the reduction in force, Cox's superiors had warned him of the problems with the distributors and his attitude toward them, and had made a preliminary determination that prior to termination on that basis he would be offered corrective counseling. Nothing in the evidence before this Court suggests, however, that the counseling policy ever was meant to apply to reductions in force, or that any other employee whose job was eliminated in such a reduction in force had been offered such counseling.

[7] Cox also claims that he was entitled to a formal exit interview before leaving Congoleum. The exit interview, however, is held only after the decision to terminate has been made, and is designed to help the employee understand the reasons for his dismissal, not to provide him with a hearing on the decision itself, or to afford him the opportunity to secure its reversal.[6] Whatever its other ramifications may be, the failure to hold an exit interview can hardly be held to constitute an act which could make the decision to terminate wrongful. Thus, because he can show no causal link between the damages he suffered from his termination and the absence of an exit interview, Cox has shown no genuine issue of material fact on this point.

Cox's remaining argument is that he was not given the benefit of procedures applicable to reductions in force. Specifically, he contends that Congoleum refused to offer him another position, either through "bumping" a less-senior employee or by filling an open position.

■ In arguing that Congoleum breached the covenant of good faith and fair dealing by refusing to allow him to "bump" a less senior employee, Cox relies upon two portions of Congoleum's handbook for salaried employees, called the "Salary Personnel Policy." Nothing in these policies, however, purports to create the right to displace an existing, less senior employee. Sections 1100 *et seq.* plainly concern mat-

---

5. Overall human experience suggests that few if any decisions are based on a single criterion. Indeed, the question "why did you leave your last job?" usually is a prime example of one which may be answered truthfully in an almost infinite number of ways. Wrongful termination cases therefore must not be confused with discrimination cases which arise under statutes designed to protect discrete and insular groups. Courts are required by the nature of those cases to examine whether the employer's reasons for adverse employment action are pretextual, largely because the statutes themselves presume a preexisting pattern of discrimination. *See, e.g., Texas Dep't of Community Affairs v. Bur-*

*dine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *see generally* B. Schlei & P. Grossman, *Employment Discrimination Law* 1313–22 (2d Ed.1983) (discussing plaintiff's burden of proving "pretext"). To apply the rules developed in such a context to wrongful termination cases not involving such matters would be to risk thrusting courts into second-guessing every employment decision.

6. It should be noted that before leaving Cox spoke with his superiors and others in the company about the reasons for his termination.

ters arising after the company has made the decision to transfer the employee, and thus do not address the threshold question of whether the employee is entitled in the first instance to transfer. Sections 1350 *et seq.* speak more directly to the issue,[7] but fall far short of establishing any right to displace or "bump" a less senior employee.[8] Cox's assertion that he was entitled to be transferred to an open position within the company is undermined by his failure to present any evidence indicating that any openings actually existed at the time he was terminated. Indeed, the undisputed evidence indicates that during the period at issue, Congoleum was in the midst of a nationwide reduction in force in which not only was Cox's position permanently eliminated, but 116 sales employees ultimately were laid off.

■ Cox also mischaracterizes the extent of his "rights" under the transfer provisions. The most that fairly may be said of these policies is that they create an expectation that the company will *consider* carefully the advisability of transfer over termination. The guidelines call for a consideration of the performance, ability, service and work attitude of the affected employee, and allow the company considerable discretion in evaluating whether the employee should be retained and transferred. The evidence indicates not that Congoleum failed to consider the possibility of transfer, only that it rejected that option. Cox is no more entitled to have a jury consider

the correctness of this decision than he would be to have it consider the correctness of a decision to terminate him for poor performance.

In short, it is enough that Congoleum considered Cox's transfer request; there is more than sufficient evidence that its decision was well within the bounds of its legitimate business judgment. Plaintiff has therefore failed to raise a genuine issue of material fact with respect to Congoleum's decision to terminate him rather than to offer him another position.

### D. *Cox's intentional misrepresentation claim must fall as well.*

In light of the Court's rulings on the wrongful discharge claims, the fact that the misrepresentation claim must fall with them requires little discussion. The thrust of the misrepresentation claim is that if Cox was not entitled by contract to be terminated only for good cause, then Congoleum intentionally misled him into thinking that he did have such an assurance. Since the case has been considered on the presumption that Plaintiff *was* entitled to be terminated only for cause, the misrepresentation claim cannot survive.

■ Even if this were not the case, as previously suggested at page 7, Cox's misrepresentation claim would fail. If a court decides that oral or implied promises do not become part of the express contract, it makes no sense to hold that the employee

---

7. The policies provide:
  1350. It is the intention of the Company to provide steady employment for all of its personnel. When business conditions require expense reductions involving the laying off of some personnel, the performance, ability, service and work attitude of employees will be given careful consideration in determining those to be retained and those to be laid off. In order to minimize the hardships of the situation, especially as to long-service, older employees, the following procedure governs:
  1351.
  .01 At the local facility, where the lay-off is impending, the current work requirements should be reviewed to determine whether any suitable positions exist which could be filled by the employee faced with lay-off. Decisions on this should be made with a practical focus

on length of service, work contribution, and potential of other employees continuing to work....
  .04 The Employee Relations Division of the General Office will review the history of the case for suitable placement and equitable treatment. When advisable, contacts may be made with other plants, with particular reference to examining the possibility of replacing certain of the short-service employees....

8. The Court further notes that relying on California law, the Ninth Circuit held in *Gianaculas,* 761 F.2d at 1395, that the covenant of good faith and fair dealing does not require an employer to displace less senior employees for the benefit of senior employees terminated as part of a reduction in force.

may nonetheless rely on a representation to the contrary and bring an action in tort.

## IV. ALTERNATIVE GROUNDS

A. *A consistent, unifying thread may be found in existing California cases.*

Although in each of the four cases considered together by this Court summary judgment was properly granted for defendant employer based on principles established by California decisions, it cannot be gainsaid that were they not to have been decided on summary judgment each case would have had substantial settlement value and would have represented considerable liability exposure before a jury right up to the time of verdict.

Moreover, one cannot blithely conclude that the result in any of these cases was so clear that skilled attorneys could not have differed as to the propriety of summary judgment under existing California law. Under existing California law, then, the plaintiffs' good faith in bringing such actions in the first place cannot be fairly questioned.

Further, it is clear that these four cases are only a trickle taken from the major flood of such cases which are inundating courts all over California and in many other states. It thus appears that the developing body of judge-made law in this area is not performing the fundamental task of law: to provide for law-abiding citizens a clear and consistent scheme for guiding their conduct toward each other.

The Court is fully cognizant that its function in a diversity case is to "apply state law as the state's highest court would." *Hillary v. Rushen,* 720 F.2d 1132, 1138 n. 5 (9th Cir.1983). When state law is not entirely clear or consistent, the Court's task is to use its "own best judgment in predicting how the state's highest court would decide the case." *Fiorito Bros., Inc. v. Fruehauf Corp.,* 747 F.2d 1309, 1314 (9th Cir.1984) (quoting *Takahashi v. Loomis Aromored Car Service,* 625 F.2d 314, 316 (9th Cir.1980)). Mindful of that task, this Court believes that if an analysis of the case law in this area reveals principles, not always clearly expressed, to which otherwise disparate cases may be reconciled and from which clearer guides for conduct may be gleaned, that analysis should be attempted.

B. *Wrongful termination cases reflect a broader social problem.*

In tackling issues regarding termination of employment, courts must recognize that they are dealing with a far larger problem even than that represented by the cases before them. A major social problem of this decade is what to do about the large numbers of executives and high-level employees, now in their fifties and older, who "paid their dues" by working their way up corporate ladders which can no longer support their collective weight.

Courts presently are being asked to decide on a case-by-case basis which of the countless employees whose services are no longer needed by their corporate employers have a "right" to their jobs, and which do not. These would be difficult questions in any time and business setting. They are particularly perplexing in the present time and setting. Not surprisingly, the cases are arising at a time when whole generations of corporate learning are being rendered irrelevant by foreign competition and changes in technology and demographics. For these and countless other reasons, corporate employers are no longer able to provide the assurance of lifetime job security, the "promise" of which undeniably was a major part of what was held out years ago to employees (then much younger) when they were first induced to join the corporate ranks.

For courts to suggest that all executives who have or may become expendable to their long-term employers are entitled to have a jury determine whether they are entitled to keep their jobs is to ignore economic reality. To suggest that juries will be able to decide fairly which executives should stay and which should go is to impute to them knowledge and wisdom about wider issues as to which the trial process cannot adequately advise them.

It seems clear, therefore, that if executives and other employees who lose their jobs because of the harsh general realities of the marketplace are not to be left to the cruelties of Adam Smith economics, the solution must be legislative rather than judicial. Rules designed for general application in this regard must come from the legislature so that everyone simultaneously is made aware of and becomes subject to the same requirements. Willing good citizens who lead the way in employment matters must not be punished for their very leadership. Neither courts nor juries are equipped to decide which of the "promises" made generally by large corporate business to all rising executives should be given legal effect, and which should be ignored. Not only are courts and juries ill-suited to such a task, the sheer volume of the resulting case load would make it impossible.

It is already clear, moreover, that any such effort would fail in its ultimate purpose. Judge-made efforts to enforce corporate "promises" which can no longer be kept have not affected the rate of terminations in any discernible way. Instead, the apparent response has been the development of a "disemployment industry" comprised of lawyers and personnel administrators whose sole job function is to assure that each and every termination of employment can defended against later legal attack. The development of such an industry in response to actions by courts serves no one's legitimate interests.

C. *The nature of the employment relation necessitates the imposition of a duty of fairness on all employers.*

Notwithstanding the foregoing, California courts have properly decided that there does exist *some* point at which they should intervene to prevent unfair treatment of individual employees by their employers. The cases have long since settled this basic question. Had the existing concept of a contractual covenant of good faith and fair dealing not been available to be transplanted from other contexts of California law, no doubt the courts would have created it.

By the act of accepting employment, an employee gives up his future right to bargain at arm's length over the terms and conditions of his employment. An employee known to be seeking other employment may be seriously jeopardizing his existing job and his future therein. Only while unemployed can an employee truly be free to make himself available for and to consider fairly all job opportunities he might wish to pursue. Yet while without a job, unless the contrary is provided by contract or by law, most employees will be without income as well. The amount of money involved, while normally insubstantial to an employer, may loom as monumental to the employee.

By choosing one employer over another, therefore, an employee incurs serious detriment not shared by his employer. The employer can locate a replacement for an existing employee and accomplish a substitution without any break in its business. Unless the employer is held to *some* duty to his employee, the employee bears virtually the entire risk that things will not work out between them.

Because by assuming the employment relation the employee's previously arm's length bargaining position becomes a subservient one, the employment relationship must give rise to fiduciary duty on the employer's part. There is no shortage of other situations in which a fiduciary duty results when the nature of a contractual relationship between parties initially at arm's length with equal bargaining power has the immediate effect of creating between them an unequal position. Examples of parties who assume such a position as part of a contractual bargain are limited partners, minority shareholders, and beneficiaries of trusts. In each case, the law provides that the party with the dominant position immediately assumes a fiduciary duty which requires him to deal fairly with the weaker party. *See, e.g., Arnold v. Humphreys,* 138 Cal.App. 637, 33 P.2d 67 (1934) (duty owed to limited partners); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 108, 81 Cal.Rptr. 592, 460 P.2d 464 (1969) (minority shareholders); *Werschkull*

*v. United California Bank,* 85 Cal.App.3d 981, 1001–02, 149 Cal.Rptr. 829 (1978) (beneficiaries of trust fund). Where there may be conflicts of interest inherent in the relationship, this duty does *not* require the dominant party to forgo its own interests, only that while pursuing them it must deal fairly with the subservient party's interests.[9]

D. *The inquiry therefore should focus on the fairness of the employee's treatment in the overall.*

The unilateral involuntary termination of employment is inherently unfair. It is the harshest act that an employer can take toward an employee. Quite naturally, therefore, the great preponderance of cases posing the basic question of an employer's duty to give fair treatment to employees has arisen from situations involving termination of employment.

As viewed by the litigants, counsel, and for the most part the courts, the focus of the inquiry in these cases has appeared to be on the employee's *right to his job:* whether on the particular facts of each case such a right existed, and if so was it violated. This Court believes that the employee's right to his job is rarely if ever the proper or even the actual focus of the judicial inquiry. If the courts, and indeed all employees and employers are to avoid being bogged down in a truly bottomless quagmire, judicial inquiry should be focused upon whether the employee was *treated fairly in the overall,* on the presumption that in all but the rarest cases an employee has no right to the job itself.

E. *Failure to focus on fairness in the overall has produced a proliferation of pigeonholes into one of which virtually every terminated employee may colorably claim to fit.*

The results in the cases to date have been reached via an analysis which on the surface focuses not on basic fairness, but rather on case-by-case application of narrow "pigeonhole" rules which prescribe the circumstances in which an employee becomes vested with a "right" to his job, what defenses negate the existence of the right, and what it takes to divest the right once it has vested. The development of these rules, not always consistently applied and invariably fuzzy around the edges, has served further to confuse both plaintiffs and defendants as to the real issues and to shape the employment relationship in unforeseen and generally negative ways.

Analyzing cases in terms of questions of "cause" and whether "like cases" have been treated "alike" (when there are few single causes for termination and no two cases which are truly "like") the present mode of analysis gives a terminated employee a colorable claim in most cases. This would not be true if the proper focus is seen to be not whether the employee's termination was fair, but whether the employee was treated fairly in the overall.

The obvious fact that unilateral involuntary termination is inherently unfair no doubt explains in part the reluctance of courts to address directly in terms of fairness the issues posed by allegedly wrongful terminations. The tendency toward a kind of "pigeonhole" analysis designed to reach the same ends is therefore understandable, but the results are not always fully reconcilable.

In California, the employment relationship traditionally has been regarded as strictly contractual. Cal. Labor Code section 2922 reflects this fact with its *quid pro quo* approach to contractual rights: employment "may be terminated at the will of either party." The legal duty imposed by the covenant of good faith and fair dealing has therefore arisen as an implied *contract* term. Anomalies arise, however, when breach of this covenant gives rise to

---

**9.** For example, in *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 108, 81 Cal.Rptr. 592 (1969), the California Supreme Court explained that majority shareholders must

use their ability to control the corporation in a fair, just and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business.

tort remedies which otherwise would be unavailable for breach of contract.[10] Further anomalies arise when courts turn around and hold that these tort remedies may be barred by contractual limitations such as the statute of frauds and the parol evidence rule, which appear to have nothing to do with the equities of the particular case. *See Foley v. Interactive Data Corp.,* 174 Cal.App.3d 282, 219 Cal.Rptr. 866 (1985), *review granted* Jan. 27, 1986; *Santa Monica Hospital v. Superior Court,* 172 Cal.App.3d 698, 218 Cal.Rptr. 543, *modified,* 173 Cal.App.3d 348d, 218 Cal. Rptr. 543 (1985), *review granted* Jan. 13, 1986; *Newfield v. Insurance Co. of the West,* 156 Cal.App.3d 440, 203 Cal.Rptr. 9 (1984).

F. *What is "fair," and how is fairness to be determined?*

Most of the problems with dealing directly with the notion of overall fairness of treatment are eliminated if it is considered that only in the rarest of cases should good faith and fair dealing be deemed to require that the employee not be terminated at all. This Court believes that the cases do not yet preclude Cal. Labor Code section 2922 from being read in accord with its plain import. From this starting point it would seem that if the question of a terminated employee's "right to his job" is to be sent to a jury at all, the plaintiff should be required to allege facts which would, if proved, so shock the conscience of the court that to provide no remedy would frustrate the clear ends of justice. Such a case ordinarily would not exist unless there were no other undisputed reason (whether or not relied upon) which would support the termination.

This very narrow rule achieves justice and may be seen to be indicated by the existing cases only if it is also recognized that the covenant of good faith and fair dealing does impose upon the employer a duty to return the terminated employee to the marketplace "whole," and free of the detriment necessarily incident to the termination of the employment relation.[11] As to this, it seems appropriate to consider again the fact that by choosing a particular employment an employee ordinarily gives up the right to consider other employment freely and without loss of income. With this in mind it seems proper to suggest that "fair" treatment ordinarily requires that the employer provide the employee with severance which is adequate to provide him with a reasonable chance of finding comparable employment without loss of income[12] and that the employer maintain an official posture with respect to the termination which does not unfairly prejudice the employee's future employment prospects.[13]

G. *Inequities are produced by punishing the leaders for developing procedures for terminating employees.*

The Court believes that the principles underlying the alternative grounds ex-

---

**10.** More pronounced anomalies threaten to arise if the reasoning of *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.,* 36 Cal.3d 752, 206 Cal.Rptr. 354 (1984), is extended and a tort cause of action is stated every time a contract is breached.

**11.** While not at issue in this case, the Court notes that if the concept of fairness is considered to be the keystone of the covenant of good faith and fair dealing, many terminations for "cause" (such as reductions in force) might well impose some duty upon the employer by way of severance and other measures to make the employee "whole" again.

One may question the justness of the present law when an employee, such as Cox, may state a colorable claim for a large sum of money merely because in addition to being part of a reduction in force he can allege "wrongful termination" on another theory, while in contrast another employee who was "only" part of a reduction in force might be put out on the street with nothing and appear to have no legal remedy whatsoever.

**12.** The Court notes that Cox received 27 weeks severance pay plus two additional weeks pay in lieu of notice. On those facts the Court would hold that Congoleum treated Cox fairly and that Cox would not state a claim for breach of the covenant of good faith and fair dealing.

**13.** Often, it must be recognized that after termination the employee will not be able to find comparable employment no matter how long he is given to look. Because this is equally consistent with the conclusion that the employee had been over-employed, it does not necessarily indicate either that the severance was inadequate or that the termination was improper.

pressed herein may be derived from the leading California decisions and are consistent with their results and reasoning, except to the extent some of the cases give particular weight to the failure of corporations to follow their own personnel procedures.[14] Where the employee is not otherwise treated unfairly, by the standards herein expressed, this Court believes those cases have gone too far and would not be followed by the California Supreme Court in a well-presented case.

The Court believes that it is unsound to give company policies the force of law and to punish violations thereof with tort damages. The increasing necessity for terminating employees at all levels has caused forward-thinking employers to address not only the perceived requirements of law, but also the ethical requirements imposed by basic institutional fairness and good business practice. Courts should not think that the policies of the major corporations, which are so often before them by virtue of alleged breach, are the norm in the business world at large. It may be that courts are seeing mainly the leaders. In this Court's view, the interests of society are not served when judge-made law, the product of well-intentioned desire to achieve social justice, steps in front of those to whom the law applies and who are already leading the way in the same direction. To do so is to punish the leaders and reward the hindmost, when the better judicial course would be to assure that the laggards do not lag too far behind.

---

14. *See, e.g. Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (employer violated public policy); *Rulon-Miller v. Internat'l Bus. Mach. Corp.,* 162 Cal. App.3d 241, 208 Cal.Rptr. 524 (1984) (employer showed bad faith and infringed on plaintiff's privacy); *Shapiro v. Wells Fargo,* 152 Cal.App.3d 467, 199 Cal.Rptr. 613 (1984) (plaintiff made no showing of bad faith intended to frustrate enjoyment of contractual rights); *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980) (while facts not entirely clear, apparently plaintiff, an 18-year employee who claimed to have been fired for union activity, could not be put back into marketplace "whole"); *Gianaculas v. Trans World Airlines, Inc.,* 761 F.2d 1391 (9th Cir.1985) (in light of fair treatment by employer, mere failure to follow company procedures did not form basis of claim of breach of covenant of good faith and fair dealing).

The case in which the result most clearly would be in question under this Court's analysis would be *DeHorney v. Bank of American National Trust and Savings Ass'n,* 777 F.2d 440 (9th Cir.1985) (withdrawn from bound volume publication; petition for rehearing stayed pending California Supreme Court decision in *Foley v. Interactive Data Corp.,* 174 Cal.App.3d 282, 219 Cal.Rptr. 866 (1985), *review granted* Jan. 30, 1986), where a violation of corporate procedures did not clearly result in overall unfairness to the plaintiff.