[No. A016455. First Dist., Div. One. Nov. 29, 1984.]

VIRGINIA RULON-MILLER, Plaintiff and Respondent, v.
INTERNATIONAL BUSINESS MACHINES CORPORATION et al.,
Defendants and Appellants.

242

**COUNSEL**

Pillsbury, Madison & Sutro, Robert M. Westberg, James J. Walsh, Phyllis A. James and George A. Sears for Defendants and Appellants.

John R. Hillsman, John A. McGuinn, Cliff Palefsky and McGuinn, Hillsman & Palefsky for Plaintiff and Respondent.

**OPINION**

**RUSHING, J.***—International Business Machines (IBM) appeals from the judgment entered against it after a jury awarded $100,000 compensatory and $200,000 punitive damages to respondent (Virginia Rulon-Miller) on claims of wrongful discharge and intentional infliction of emotional distress. Rulon-Miller was a low-level marketing manager at IBM in its office products division in San Francisco. Her termination as a marketing manager at IBM came about as a result of an accusation made by her immediate super-

---

*Assigned by the Chairperson of the Judicial Council.

visor, defendant Callahan, of a romantic relationship with the manager of a rival office products firm, QYX.

## Factual Background

IBM is an international manufacturer of computers, office equipment and telecommunications systems. As well, it offers broad general services in the data processing field. It is reputed to be the single most successful high technology firm in the world. It is also a major force in the low technology field of typewriters and office equipment.

IBM is an employer traditionally thought to provide great security to its employees as well as an environment of openness and dignity. The company is organized into divisions, and each division is, to an extent, independent of others. The company prides itself on providing career opportunities to its employees, and respondent represents a good example of this. She started in 1967 as a receptionist in the Philadelphia Data Center. She was told that "career opportunities are available to [employees] as long as they are performing satisfactorily and are willing to accept new challenges." While she worked at the data center in Philadelphia, she attended night school and earned a baccalaureate degree. She was promoted to equipment scheduler and not long after received her first merit award. The company moved her to Atlanta, Georgia where she spent 15 months as a data processor. She was transferred to the office products division and was assigned the position of "marketing support representative" in San Francisco where she trained users (i.e., customers) of newly purchased IBM equipment. Respondent was promoted to "product planner" in 1973 where her duties included overseeing the performance of new office products in the marketplace. As a product planner, she moved to Austin, Texas and later to Lexington, Kentucky. Thereafter, at the urging of her managers that she go into sales in the office products division, she enrolled at the IBM sales school in Dallas. After graduation, she was assigned to San Francisco.

Her territory was the financial district. She was given a performance plan by her management which set forth the company's expectations of her. She was from time to time thereafter graded against that plan on a scale of one through five with a grade of one being the highest. After her first year on the job, she was given a rating of one and was felt by her manager to be a person who rated at the top of IBM's scale.

A little over a year after she began in San Francisco, IBM reorganized its office products division into two separate functions, one called office systems and another called office products. Respondent was assigned to

office systems; again she was given ratings of one and while there received a series of congratulatory letters from her superiors and was promoted to marketing representative. She was one of the most successful sales persons in the office and received a number of prizes and awards for her sales efforts.[1] IBM's system of rewarding salespersons has a formalistic aspect about it that allows for subtle distinctions to be made while putting great emphasis on performance; respondent exercised that reward system to its fullest. She was a very successful seller of typewriters and other office equipment.

She was then put into a program called "Accelerated Career Development Program" which was a way of rewarding certain persons who were seen by their superiors as having management potential. IBM's prediction of her future came true and in 1978 she was named a marketing manager in the office products branch.

IBM knew about respondent's relationship with Matt Blum well before her appointment as a manager. Respondent met Blum in 1976 when he was an account manager for IBM. That they were dating was widely known within the organization. In 1977 Blum left IBM to join QYX, an IBM competitor, and was transferred to Philadelphia. When Blum returned to San Francisco in the summer of 1978, IBM personnel were aware that he and respondent began dating again. This seemed to present no problems to respondent's superiors, as Callahan confirmed when she was promoted to manager. Respondent testified: "Somewhat in passing, Phil said: I heard the other day you were dating Matt Blum, and I said: Oh. And he said, I don't have any problem with that. You're my number one pick. I just want to assure you that you are my selection." The relationship with Blum was also known to Regional Manager Gary Nelson who agreed with Callahan. Neither Callahan nor Nelson raised any issue of conflict of interest because of the Blum relationship.

Respondent flourished in her management position, and the company, apparently grateful for her efforts, gave her a $4,000 merit raise in 1979 and told her that she was doing a good job. A week later, her manager, Phillip Callahan, left a message that he wanted to see her.

When she walked into Callahan's office he confronted her with the question of whether she was *dating* Matt Blum. She wondered at the relevance

[1]In 1978 she fulfilled her annual sales quota in the fifth month of the year. She was given a "Golden Circle Award" in her third year of sales which is a recognition of superior sales by the company. She had been a member of the "100 Percent Club" for each of the years that she was in the San Francisco office.

of the inquiry and he said the dating constituted a "conflict of interest," and told her to stop dating Blum or lose her job and said she had a "couple of days to a week" to think about it.[2]

The next day Callahan called her in again, told her "he had made up her mind for her," and when she protested, dismissed her.[3] IBM and Callahan claim that he merely "transferred" respondent to another division.

---

[2]Because of the importance of this testimony, we set it out verbatim. Respondent testified: "I walked into Phil's office and he asked me to sit down and he said: Are you dating Matt Blum?

"And I said, What? I was kind of surprised he would ask me and I said: Well, what difference does it make if I'm dating Matt Blum? . . .

"And he said, well, something to the effect: I think we have a conflict of interest, or the appearance of a conflict of interest here.

"And I said: Well, gee, Phil, you've, you've pointed out to me that there are no problems in the office because I am dating Matt Blum, and I don't really understand why that would have any, you know, pertinency to my job. You said I am doing an okay job. I just got a raise.

"And he said: Well, I think we have a conflict of interest. . . .

"He said: No and he said: I'll tell you what. He said: I will give you a couple of days to a week. Think this whole thing over.

"I said: Think what over?

"And he said: You either stop dating Matt Blum or I'm going to take you out of your management job.

"And I was just kind of overwhelmed."

[3]Respondent stated the next day she was again summoned to his office where Callahan sat ominously behind a desk cleared of any paperwork, an unusual scenario for any IBM manager.

She further testified: "I walked into Phil's office, and he asked me to shut the door, and he said he was removing me from management effectively immediately. And I said: What?

"And he repeated it. And I was taken aback, I was a little startled, and I think I said: Well, gee, I thought I had a couple of days to a week to think over the situation that we discussed yesterday.

"And he said: I'm making the decision for you.

"And I said: Phil, you've told me that I'm doing a good job. You told me that we are not losing anybody to QYX because I am dating Matt Blum, that we are not losing any equipment to QYX. I just don't understand what bearing dating has to do with my job.

"And he said: We have a conflict of interest. . . .

"I said: Well, what kind of a job would it be?

"And he said: Well, I don't have it, but it will be non-management. You won't be a manager again.

"Pardon me? . . .

"And I think I was getting very upset so I think I said something because of that respect for the individual tenet of IBM's that I really believed in I didn't think that he was following what I thought IBM, really did believe in. And he just said: You know, you are removed from management effective immediately.

"And I said: I think you are dismissing me.

"And he said: If you feel that way, give me your I.D. card and your key to the office. [¶] I want you to leave the premises immediately.

"And I was just about to burst into tears, and I didn't cry at work, so I basically fled his office.

"I felt he dismissed me."

## DISCUSSION

Respondent's claims of wrongful discharge and intentional infliction of emotional distress were both submitted to the jury. Appellant argues that the jury should not have been permitted to consider the issue of wrongful discharge because as a matter of law the offer of reassignment cannot be considered a wrongful discharge. In developing this argument, IBM attempts to change the nature of this case from one of wrongful termination into a debate about constructive discharge through an alleged administrative reassignment.

The test for the court here is substantial evidence (see *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]) and without any question there was substantial evidence to support the jury verdict that the respondent was wrongfully discharged rather than routinely reassigned.

The initial discussion between Callahan and respondent of her relationship with Blum is important. We must accept the version of the facts most favorable to the respondent herein. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) When Callahan questioned her relationship with Blum, respondent invoked her right to privacy in her personal life relying on existing IBM policies. A threshold inquiry is thus presented whether respondent could reasonably rely on those policies for job protection. Any conflicting action by the company would be wrongful in that it would constitute a violation of her contract rights. (*Lord* v. *Goldberg* (1889) 81 Cal. 596 [22 P. 1126]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917].)

Under the common law rule codified in Labor Code section 2922, an employment contract of indefinite duration is, in general, terminable at "the will" of either party. This common law rule has been considerably altered by the recognition of the Supreme Court of California that implicit in any such relationship or contract is an underlying principle that requires the parties to deal openly and fairly with one another. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158].) This general requirement of fairness has been identified as the covenant of good faith and fair dealing. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R. 4th 314].) The covenant of good faith and fair dealing embraces a number of rights, obligations, and considerations implicit in contractual relations and certain other relationships. At least two of those considerations are relevant herein. The duty of fair dealing by an employer

is, simply stated, a requirement that like cases be treated alike. Implied in this, of course, is that the company, if it has rules and regulations, apply those rules and regulations to its employees as well as affording its employees their protection.

As can be seen from an analysis of other cases, this is not in any substantial way a variation from general contract law in California, for if an employee has the right in an employment contract (as distinct from an implied covenant), the courts have routinely given her the benefit of that contract. (Rest.2d Contracts, § 81; 1A Corbin on Contracts (1963) § 152, pp. 13-17; see also cases cited in *Pugh, supra,* 116 Cal.App.3d at p. 325.) Thus, the fair dealing portion of the covenant of good faith and fair dealing is at least the right of an employee to the benefit of rules and regulations adopted for his or her protection.

██ In this case, there is a close question of whether those rules or regulations permit IBM to inquire into the purely personal life of the employee. If so, an attendant question is whether such a policy was applied consistently, particularly as between men and women. The distinction is important because the right of privacy, a constitutional right in California (*City and County of San Francisco* v. *Superior Court* (1981) 125 Cal.App.3d 879, 883 [178 Cal.Rptr. 435]), could be implicated by the IBM inquiry. Much of the testimony below concerned what those policies were. The evidence was conflicting on the meaning of certain IBM policies. We observe ambiguity in the application but not in the intent. The "Watson Memo" (so called because it was signed by a former chairman of IBM) provided as follows:

"To ALL IBM MANAGERS:

"The line that separates an individual's on-the-job business life from his other life as a private citizen is at times well-defined and at other times indistinct. But the line does exist, and you and I, as managers in IBM, must be able to recognize that line.

"I have seen instances where managers took disciplinary measures against employees for actions or conduct that are not rightfully the company's concern. These managers usually justified their decisions by citing their personal code of ethics and morals or by quoting some fragment of company policy that seemed to support their position. Both arguments proved unjust on close examination. What we need, in every case, is balanced judgment which weighs the needs of the business and the rights of the individual.

"Our primary objective as IBM managers is to further the business of this company by leading our people properly and measuring quantity and quality of work and effectiveness on the job against clearly set standards of responsibility and compensation. This is performance—and performance is, in the final analysis, the one thing that the company can insist on from everyone.

"We have concern with an employee's off-the-job behavior only when it reduces his ability to perform regular job assignments, interferes with the job performance of other employees, or if his outside behavior affects the reputation of the company in a major way. When on-the-job performance is acceptable, I can think of few situations in which outside activities could result in disciplinary action or dismissal.

"When such situations do come to your attention, you should seek the advice and counsel of the next appropriate level of management and the personnel department in determining what action—if any—is called for. Action should be taken only when a legitimate interest of the company is injured or jeopardized. Furthermore the damage must be clear beyond reasonable doubt and not based on hasty decisions about what one person might think is good for the company.

"IBM's first basic belief is respect for the individual, and the essence of this belief is a strict regard for his right to personal privacy. This idea should never be compromised easily or quickly.

"/s/ Tom Watson, Jr."

It is clear that this company policy insures to the employee both the right of privacy and the right to hold a job even though "off-the-job behavior" might not be approved of by the employee's manager.

IBM had adopted policies governing employee conduct. Some of those policies were collected in a document known as the "Performance and Recognition" (PAR) Manual. IBM relies on the following portion of the PAR Manual:

"A conflict of interest can arise when an employee is involved in activity for personal gain, which for any reason is in conflict with IBM's business interests. Generally speaking, 'moonlighting' is defined as working at some activity for personal gain outside of your IBM job. If you do perform outside work, you have a special responsibility to avoid any conflict with IBM's business interests.

"Obviously, you cannot solicit or perform in competition with IBM product or service offerings. Outside work cannot be performed on IBM time, including 'personal' time off. You cannot use IBM equipment, materials, resources, or 'inside' information for outside work. Nor should you solicit business or clients or perform outside work on IBM premises.

"Employees must be free of any significant investment or association of their own or of their immediate family's [*sic*], in competitors or suppliers, which might interfere or be thought to interfere with the independent exercise of their judgment in the best interests of IBM."

This policy of IBM is entitled "Gifts" and appears to be directed at "moonlighting" and soliciting outside business or clients on IBM premises. It prohibits "significant investment" in competitors or suppliers of IBM. It also prohibits "association" with such persons "which might interfere or be thought to interfere with the independent exercise of their judgment in the best interests of IBM."

Callahan based his action against respondent on a "conflict of interest." But the record shows that IBM did not interpret this policy to prohibit a romantic relationship. Callahan admitted that there was no company rule or policy requiring an employee to terminate friendships with fellow employees who leave and join competitors.[4] Gary Nelson, Callahan's superior, also confirmed that IBM had no policy against employees socializing with competitors.

This issue was hotly contested with respondent claiming that the "conflict of interest" claim was a pretext for her unjust termination. Whether it was presented a fact question for the jury.

Do the policies reflected in this record give IBM a right to terminate an employee for a conflict of interest? The answer must be yes, but whether respondent's conduct constituted such was for the jury. We observe that while respondent was successful, her primary job did not give her access to sensitive information which could have been useful to competitors. She was, after all, a seller of typewriters and office equipment. Respondent's brief makes much of the concession by IBM that there was no evidence whatever that respondent had given any information or help to IBM's competitor QYX. It really is no concession at all; she did not have the information or

---

[4]An interesting side issue to this point is that Blum continued to play on an IBM softball team while working for QYX.

help to give. Even so, the question is one of substantial evidence. The evidence is abundant that there was no conflict of interest by respondent.

It does seem clear that an overall policy established by IBM chairman Watson was one of no company interest in the outside activities of an employee so long as the activities did not interfere with the work of the employee. Moreover, in the last analysis, it may be simply a question for the jury to decide whether, in the application of these policies, the right was conferred on IBM to inquire into the personal or romantic relationships its managers had with others. This is an important question because IBM, in attempting to reargue the facts to us, casts this argument in other terms, namely: that it had a right to inquire even if there was no evidence that such a relationship interfered with the discharge of the employee's duties *because* it had the effect of diminishing the morale of the employees answering to the manager. This is the "Caesar's wife" argument; it is merely a recast of the principal argument and asks the same question in different terms.[5] The same answer holds in both cases: there being no evidence to support the more direct argument, there is no evidence to support the indirect argument.

Moreover, the record shows that the evidence of rumor was not a basis for any decline in the morale of the employees reporting to respondent. Employees Mary Hrize and Wayne Fyvie, who reported to respondent's manager that she was seen at a tea dance at the Hyatt Regency with Matt Blum and also that she was not living at her residence in Marin, did not believe that those rumors in any way impaired her abilities as a manager. In the initial confrontation between respondent and her superior the assertion of the right to be free of inquiries concerning her personal life was based on substantive direct contract rights she had flowing to her from IBM policies. Further, there is no doubt that the jury could have so found and on this record we must assume that they did so find.

### The Claim of Instructional Error

Appellant claims that the trial judge erred in instructing the jury with respect to the standard set forth in special instruction number 2. However, it is clear that the court's special instructions numbers 2 [definition of good

---

[5] What we mean by that is that if you charge that an employee is passing confidential information to a competitor, the question remains whether the charge is true on the evidence available to the person deciding the issue, in this case, the respondent's managers at IBM. If you recast this argument in the form of the "Caesar's wife" argument attempted by IBM, it will be seen that exactly the same question arises, namely, "is it true?" Indeed, the import of the argument is that the rumor, or an unfounded allegation, could serve as a basis for the termination of the employee.

cause], 33 [employer good faith in honest but mistaken belief], 22 [employer business judgment and sensitive positions] and 3 [factors for good faith discharge] adequately covered the issue and we discern no error in either *the instructions or the standards to be applied by the jury.* ■ Indeed in the court's special instruction number 3 the jury was given seven factors that they could take into account in determining whether an employer acted in good faith or bad faith in discharging an employee from employment.[6]

Thus the court instructed the jury on the several separate theories of law including the several factual accounts that gave support to plaintiff's claim for wrongful discharge including defendant's claim that such discharge was privileged.

In the recent case of *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, the Supreme Court noted that certain other contractual relationships characterized by elements of public interest, adhesion and fiduciary responsibility may well be subject to tort action for breach of the covenant of good faith and fair dealing. (36 Cal.3d at pp. 768-769.)

The court went on to suggest that an employment relationship might give rise to tort remedies because the "relationship has some of the same characteristics as the relationship between insurer and insured." (*Id.,* at p. 769, fn. 6; see also *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] [pension agreement held to contain characteristics which allow a tort cause of action for breach].)

The court found it unnecessary to directly address the issue, enunciating a broader principle that ". . . a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Seaman's, supra,* 36 Cal.3d at p. 769.) The lesson to be derived seems to be that denial of the existence of a contract without more is not actionable in tort.

---

[6]The factors to be considered under the court's special instruction number 3 are (1) whether or not the employee was discharged for legitimate business and employment reasons; (2) whether or not the employee was discharged on a pretext, that is, for a false reason or motive put forth to hide the real one; (3) whether or not the employee was engaged in a sensitive or confidential management position; (4) whether or not the employee had a conflict of interest; (5) whether or not the employee's personal, private or social relationships endangered, injured or jeopardized the employer's legitimate business interests; (6) whether or not the employer violated, invaded or infringed upon the employee's personal privacy and personal, private and social relationships; (7) whether or not the employee was discriminated against by the employer because of that employee's sex, citing *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722]; *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d 311, and BAJI No. 12.98, as modified.

In the case at bar, Callahan *denied* the employment rights asserted by respondent. At the second meeting he "stonewalled" respondent when she insisted on her rights and then fired her when she persisted. The *conduct* of the breaching party is the focus of the tort, particularly where there is an attempt to shield oneself from liability, in bad faith and without probable cause. Here, the "conflict of interest" charge was untrue and was used as a pretext to legitimate the termination. "Probable cause" would have been some reasonable basis for assuming that a significant company interest was at stake. There is no such evidence claimed by IBM. It is the admitted absence of any such evidence that leads us to conclude there was no probable cause here. Thus, the charge was made in bad faith and without probable cause.

The jury was specifically instructed on "bad faith." (See special instruction No. 3, *supra.*) Moreover, in instruction number 33 the judge told the jury that "an employer who acts in good faith on an honest but mistaken belief that discharge of an employee is required by legitimate business interests has not committed a wrongful discharge of the employee." The failure to give such an instruction, tailored appropriately to the facts of the case, was the principal reason for the reversal in *Seaman's, supra,* 36 Cal.3d at pages 769-770.[7]

Thus the principle enunciated in *Seaman's,* that a party to a contractual relationship may not, in denying the existence of the contract, do so in bad faith and without probable cause, focuses necessarily on the actual conduct of the breaching party. It is not so much the duty owed under the contract as the duty arising from the relationship of one party to another. (See *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668, 676, 677 [44 P. 320].) That duty, at least, is implied from the formulation of the tort, namely, to act without bad faith and with probable cause. Here, Callahan breached that duty. The issue put to the jury was whether the conflict of interest charge was a pretext for firing respondent. This question required the jury to decide if Callahan had any belief in the existence of such a breach of company policy. On this record, the jury found that he did not. The evidence supports the jury verdict.

---

[7]Knowledge was the logical equivalent of an intentional act in *Seaman's.* But as the court pointed out, that there was knowledge by defendant is the beginning of the inquiry, not the end. If the jury in *Seaman's* had been instructed that it might infer culpable intent from conduct, the jury's verdict would have stood. Here, the jury was not in any such way misled. It was told it could infer wrongfulness by defendants from their conduct.

## Intentional Infliction of Emotional Distress

The contract rights in an employment agreement or the convenant of good faith and fair dealing gives both employer and employee the right to breach and to respond in damages. ■ Here, however, the question is if IBM elected to exercise that right, should it also be liable for punitive damages because of its intentional infliction of emotional distress. The issue is whether the conduct of the marketing manager of IBM was "extreme and outrageous," a question involving the objective facts of what happened in the confrontation between the employee and employer as well as the special susceptibility of suffering of the employee.

■ The general rule is that this tort, in essence, requires the defendant's conduct to be so extreme and outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498-499 [86 Cal.Rptr. 88, 468 P.2d 216], particularly at fn. 5 quoting Rest.2d Torts § 46, com. d.)[8]

■ The question is reduced to the inquiry of whether Callahan's statements and conduct could be found by the jury to fall within doctrinal requirements. ■ " 'It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.' " (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) "Where reasonable men may differ" the court must instruct the jury on the law and entrust the factual determination to it. (*Fuentes* v. *Perez* (1977) 66 Cal.App.3d 163, 172 [136 Cal.Rptr. 275].) ■ The finding on this cause of action as reflected herein is sufficient to support the award of punitive damages. (*Fletcher, supra,* at p. 404.)

The jury was entitled to consider the evidence of extreme and outrageous conduct in light of the June 7 exchange followed by Callahan's conduct and

---

[8]See also *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 945-947 [160 Cal.Rptr. 141, 603 P.2d 58] [employee subjected to racial epithets and profane insults]; *Kelly* v. *General Telephone Co.* (1982) 136 Cal.App.3d 278, 287 [186 Cal.Rptr. 184] [false accusation of serious crime and alteration of personal records]; *McGee* v. *McNally* (1981) 119 Cal.App.3d 891, 896 [174 Cal.Rptr. 213] [campaign of harassment designed to deprive plaintiff of his job and to replace him with a fellow worker]; *Lagies* v. *Copley* (1980 110 Cal.App.3d 958 [168 Cal.Rptr. 368] [attempt to undermine professional credibility as well as professional harassment]; *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal.Rptr. 447] [rude and degrading treatment including surveillance and interrogation]; *Toney* v. *State of California* (1976) 54 Cal.App.3d 779 [126 Cal.Rptr. 869] [insidious racial harassment]; *Hall* v. *May Department Stores Co.* (1978) 292 Ore. 131 [637 P.2d 126] [threat of arrest with no evidence to support charge]; *Rogers* v. *Loews L'enfant Plaza Hotel* (D.C. Cir. 1981) 526 F.Supp. 523., 529-531 [sexual harassment].

pretextual statements, as well as in light of express corporate policy as manifested by the Watson memo. Indeed, the concern of the Watson memo is also a right protected by law. As we earlier noted "the right of privacy is unquestionably a 'fundamental interest of our society'" (*City and County of San Francisco* v. *Superior Court, supra,* 125 Cal.App.3d 879, 882.) It is guaranteed to all people by article I, section 1, of the state Constitution. So the question is whether the invasion of plaintiff's privacy rights by her employer, in the setting of this case, constitutes extreme and outrageous conduct. The jury by special verdict so found.

To determine if Callahan's conduct could reach the level of extreme, outrageous, and atrocious conduct, requires detailed examination. First, there was a decided element of deception in Callahan acting as if the relationship with Blum was something new. The evidence was clear he knew of the involvement of respondent and Blum well before her promotion. Second, he acted in flagrant disregard of IBM policies prohibiting him from inquiring into respondent's "off job behavior." By giving respondent "a few days" to think about the choice between job and lover, he implied that if she gave up Blum she could have her job. He then acted without giving her "a few days to think about it" or giving her the right to choose.

So far the conduct is certainly unfair but not atrocious. What brings Callahan's conduct to an actionable level is the way he brought these several elements together in the second meeting with respondent. He said, after calling her in, "I'm making the decision for you." The implications of his statement were richly ambiguous, meaning she could not act or think for herself, or that he was acting in her best interest, or that she persisted in a romantic involvement inconsistent with her job. When she protested, he fired her.

The combination of statements and conduct would under any reasoned view tend to humiliate and degrade respondent. To be denied a right granted to all other employees for conduct unrelated to her work was to degrade her as a person. His unilateral action in purporting to remove any free choice on her part contrary to his earlier assurances also would support a conclusion that his conduct was intended to emphasize that she was powerless to do anything to assert her rights as an IBM employee. And such powerlessness is one of the most debilitating kinds of human oppression. The sum of such evidence clearly supports the jury finding of extreme and outrageous conduct.

Accordingly we conclude that the emotional distress cause of action was amply proved and supports the award of punitive damages. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 927-928.)

The judgment is affirmed.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied December 28, 1984, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied February 27, 1985. Kaus, J., Grodin, J., and Lucas, J., were of the opinion that the petition should be granted.