860 P.2d 487

**Fred E. WELLER, Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency, and Blue Circle Atlantic, Inc., Appellees.**

**No. 1 CA–UB 91–026.**

Court of Appeals of Arizona, Division 1, Department B.

Feb. 11, 1993.

Review Denied Nov. 4, 1993.*

* Zlaket and Martone, JJ., of the Supreme Court, voted to grant review.

Southern Arizona Legal Aid, Inc. by Erika Anne Kreider, Tucson, for appellant.

Grant Woods, Atty. Gen. by Bonnie E. Elber, Asst. Atty. Gen., Phoenix, for appellee (ADES).

Fennemore Craig by John J. Balitis, Donald Gilbert and Timothy Berg, Phoenix, for appellee (Blue Circle).

**OPINION**

LANKFORD, Judge.

This is an appeal from an Arizona Department of Economic Security ("DES") decision denying a claim for unemployment benefits. Although the employee's claim was initially allowed, on administrative review the DES Appeals Board ultimately determined that the appellant employee was discharged for work-related misconduct and was therefore disqualified for benefits pursuant to Ariz.Rev.Stat. ("A.R.S.") § 23–775. The Appeals Board held that the employee had committed misconduct by violating a known, uniformly enforced and reasonable rule imposed by his employer.

The central issue presented on appeal is whether the employer's rule is work-connected and reasonable, for only a violation of such a rule constitutes employee misconduct disqualifying the employee from unemployment benefits.

I.

On Monday, June 27, 1988, Fred E. Weller reported to work as a heavy equipment operator, just as he had done for more than twelve years. On this particular day, however, Mr. Weller's employer, Blue Circle Atlantic, Inc. ("Blue Circle") subjected him to a drug test pursuant to the employer's new mandatory drug testing policy. Blue Circle's drug testing policy required no cause to precipitate testing but was a sweeping policy permitting random testing of all employees.[1]

1. Blue Circle announced the mandatory drug testing program on April 15, 1988. On May 13, Blue Circle informed its employees that drug testing would begin on June 15, and would run

The record shows that the employer never observed Weller using drugs or alcohol at work. Nor were there ever any indications that Weller was intoxicated or impaired on the job, when the test was administered, or indeed at any other time during his twelve years of employment. Weller had never been arrested or convicted for any alcohol or drug-related offense. During his tenure with Blue Circle and its predecessor, Weller was involved in only two accidents, neither of which resulted in disciplinary action.

Blue Circle terminated Weller's employment on July 1, 1988, after Weller's urine sample tested positive for cannabinoid metabolites, the byproducts created by the body's interaction with the chemical ingredients of marijuana. Marijuana is, of course, an unlawful substance. A.R.S. § 13-3405.

An initial analysis was performed with an enzyme-multiplied immunoassay test or "EMIT." According to the record, the EMIT has a margin of error of approximately 5% for marijuana. A confirmatory analysis was performed by gas chromatography/mass spectrometer test (GC/MS), which has a reported accuracy rate of 99.-99%.

Both tests yielded readings of 60 nanograms of cannabinoids per milliliter (ng/ml) of urine. A nanogram is one-billionth of a gram; a milliliter is one-thousandth of a liter.

Blue Circle set the threshold quantity of cannabinoids that would be regarded as a "positive" test indication of marijuana consumption. Blue Circle chose 50 ng/ml of cannabinoid metabolites in urine as the threshold. Below that level, an employee would be regarded as not having used marijuana; above that level, the employee would be deemed to have used the drug.

Mr. Weller testified at the administrative hearing that he had never used drugs or alcohol at work. Moreover, Weller testified that he was told that if there were any reason to believe that he would not pass the test, he should not take it. He responded that he would gladly take the test because he "had nothing to hide."

After Blue Circle terminated Weller's employment based on the urinalysis result, Weller filed a claim for unemployment benefits. A DES Deputy granted the benefits, determining that Weller had been discharged for reasons other than misconduct connected with his employment and that therefore, he was eligible for benefits.

Blue Circle contested this determination. However, the DES Appeal Tribunal affirmed the decision of the deputy. The tribunal found that the employer did not produce sufficient evidence of misconduct to refute the denial of misconduct by Mr. Weller. See Ariz.Admin.Code ("A.A.C.") R6-3-51190.

Blue Circle again appealed the decision allowing benefits. Blue Circle argued to the DES Appeals Board that its drug testing policy was a reasonable rule of employment. Blue Circle contended, as it does here, that *any* tested level of cannabinoid metabolites is misconduct which disqualifies employees from receiving unemployment compensation.

The Appeals Board agreed with Blue Circle and reversed the decision allowing benefits. The Board held that Mr. Weller had been discharged for violating the company drug testing rule, and that the violation constituted misconduct connected with his employment. Upon Weller's request for review of the Board's decision, the Board affirmed its conclusion that his termination was based on disqualifying misconduct. We granted Weller's application for appeal to this court pursuant to A.R.S. § 41-1993.

through July 15, 1988. All employees were subject to the substance abuse tests, and any employee refusing to submit to the test was subject to immediate termination. Blue Circle notified its employees that assistance was available for any employee with a substance abuse problem and directed such employees to seek this assis-

tance before testing began on June 15. Blue Circle assured its employees that they would not be terminated if they sought assistance. However, substance abuse assistance would be available only once, and repeat offenders would be subject to immediate dismissal.

Although Weller makes several arguments on appeal, the central question is this: Is Blue Circle's rule—that a positive test for *any* level of cannabinoid metabolites in urine *alone* warrants termination of employment—work-related and reasonable, such that violation of the rule disqualifies the employee from receiving unemployment compensation? We hold that it is not.

## II.

We begin by stating what our opinion does not do. It does not decriminalize drug abuse. It does not forbid employers from terminating employees who abuse drugs. It does not prevent employers from conducting drug tests. It does not require that unemployment benefits be paid to those who abuse drugs in the workplace or who are intoxicated at work due to drug abuse elsewhere.

■ Instead, we hold only that the employer has not met its burden of proof in this case. The Legislature has confined disqualification from receiving unemployment benefits for the violation of a company rule to those violations which adversely affected the workplace in some way. The employer has the burden of proving that the employee's actions constitute disqualifying misconduct. *Castaneda v. Arizona Dep't of Economic Sec.*, 168 Ariz. 491, 494, 815 P.2d 418, 421 (App.1991); *Prebula v. Arizona Dep't of Economic Sec.*, 138 Ariz. 26, 672 P.2d 978 (App.1983).[2] Whether Blue Circle met its burden of proving that Mr. Weller's test result was disqualifying misconduct is a question of law freely reviewable by this court. *See Castaneda,* 168 Ariz. at 494, 815 P.2d at 421. We

therefore address whether Blue Circle proved that Weller's violation adversely affected the workplace.

■ Our opinion should not be read as requiring employers to retain workers who abuse drugs. The Legislature has not precluded employers from terminating employees who use drugs either on the job or off. Instead, it has merely protected the employee's right to receive unemployment compensation when the reason for the employee's termination was not demonstrably work-related. Misconduct justifying an employer in terminating an employee and misconduct disqualifying an employee from benefits are two distinct concepts. *See Arizona Dep't of Economic Security v. Magma Copper Co.,* 125 Ariz. 389, 394, 609 P.2d 1089, 1094 (App.1980). In employment-at-will situations, an employee agrees to abide by the rules of his employer as a condition of employment. Therefore, an employee who violates the employer's rule may be terminated. Indeed, at-will employment may be terminated at the pleasure of either party with or without cause. *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 381, 710 P.2d 1025, 1036 (1985). Thus, an employer who terminates an at-will employee for failing a drug test ordinarily incurs no civil liability.

The present appeal does not involve any claim by Mr. Weller for civil damages: instead, he seeks unemployment compensation from the state.[3] Unlike the fairly narrow rules of civil liability for wrongful termination of employment, the unemployment compensation system is intended to be generously protective of workers and their families. The Arizona Legislature intended the Employment Security Act to

---

**2.** The DES has by regulation, A.A.C. R6-3-51190(B)(2)(b), established this rule:

> B. Burden of Proof and presumption
> 2. The burden of proof rests upon the individual who makes a statement.

> ·    ·    ·    ·    ·

> b. When a discharge has been established, *the burden of proof rests on the employer to show that it was for disqualifying reasons.* This burden may be discharged by an admission by the claimant, or his failure or refusal to deny the charge when faced with it.

> c. An employer who discharges a worker and charges misconduct but refuses or fails to bring forth any evidence to dispute a denial by the claimant does not discharge the burden of proof.
> (Emphasis added).

**3.** The employer pays contributions to the unemployment compensation fund, and the amounts of these payments are affected by past benefits paid to that employer's former employees. A.R.S. § 23-731. *See generally* A.R.S. §§ 23-701-709, 23-721-751.

lighten the burden which "so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires the protection against this greatest hazard of economic life." A.R.S. § 23–601.

On the other hand, the benefits are limited to "persons unemployed through no fault of their own." A.R.S. § 23–601. Consequently, an employee discharged for certain kinds of misconduct is not entitled to unemployment benefits. A.R.S. § 23–775(2). As discussed below, disqualifying misconduct is defined in the statutes and regulations.

■ To meet the legislative goals of the Employment Security Act, the Appeals Board must liberally interpret the law and the facts to grant benefits and narrowly to deny benefits. *Munguia v. Department of Economic Security*, 159 Ariz. 157, 162, 765 P.2d 559, 564 (App.1988). This court views evidence in the light most favorable to upholding the decision of the Appeals Board and will affirm the decision unless it is arbitrary, capricious, or an abuse of discretion. *Castaneda*, 168 Ariz. at 494, 815 P.2d at 421; *Warehouse Indemnity v. Arizona Dep't of Economic Sec.*, 128 Ariz. 504, 627 P.2d 235 (App.1981). However, we may substitute our judgment for the agency's conclusions regarding the legal effect of facts. *Id.; Gardiner v. Arizona Dep't of Economic Sec.*, 127 Ariz. 603, 605, 623 P.2d 33, 35 (App.1980).

### III.

We must follow the Legislature's provisions regarding eligibility for unemployment benefits. The Legislature has defined misconduct which disqualifies a worker from benefits as follows:

> Wilful or negligent misconduct *connected with work* includes, but is not limited to:

> .    .    .    .    .

7. Violation without good cause of any rule of conduct, safety rule or other rule in any way *related to the employment* which is *reasonably imposed* and communicated by the employer or which can be reasonably implied from the type of employment.

A.R.S. § 23–619.01(B)(7) (emphasis added).

■ Rules promulgated by DES pursuant to A.R.S. 41–1954(A)(3) further provide that violating an employer's rule is disqualifying misconduct only if the rule is known or should have been known by the employee, is uniformly enforced, and is "reasonable." A.A.C. R6–3–51485(A). "A disqualification for misconduct is assessed only when a claimant's discharge is determined to be in 'connection with the work.'" A.A.C. R6–3–5185(A). The record on appeal indicates without dispute that Blue Circle's substance abuse policy was made known to all company employees and was uniformly enforced. We are concerned, therefore, only with the reasonableness and work-relatedness of Blue Circle's rule.[4]

Thus, Blue Circle bears the burden of proving that its rule providing for termination of employees solely on the basis of positive marijuana test results, without more, is "connected with the work" and is "reasonable."

### IV.

■ For the following reasons, Blue Circle failed to discharge its burden of proving that its rule is both reasonable and work-related. First, Blue Circle never connected the positive test result with either drug use or intoxication at work. According to Blue Circle's own expert witness, Weller's "positive" test result did not show that he was intoxicated or in any way impaired on the job. Nor did the urinalysis show when the substance had been consumed (on the job or off), how much had been consumed, or

---

4. The dissent implies that Blue Circle's rule need not be directly or demonstrably work-related. (Dissenting Opinion at 229, 860 P.2d at 496). This is contrary to both statute and rule. *See* A.R.S. § 23–619.01(B)(7); A.A.C. R6–3–5185(A) (quoted in text, *supra*). That another rule, A.A.C. R6–3–51270, explicitly requires that discharge misconduct be work-related. In fact, this rule specifically references the general requirement found in R6–3–5185 of a connection with the work.

whether the consumption had been by direct inhalation or by passive inhalation of smoke from other users.

Similarly, Blue Circle introduced no evidence whatever to show that its 50 ng/ml value for a "positive" test result was anything more than its own arbitrarily established figure. The EMIT and the gas chromatography/mass spectroscopy analyses used by Blue Circle are apparently standard procedures in drug testing. However, the basis for characterizing a test result as a "positive" indication for cannabinoid metabolites in urine is not established by this record. The record in this case contain no evidence whatever to support the Appeal Board's conclusion that 50 ng/ml is an industry-wide standard.

No other evidence linked Weller's test result with his work. For example, Blue Circle offered neither evidence of the addictive nature of marijuana, nor of a correlation between off-duty use and on-the-job use sufficient to support an inference that off-duty use makes on-duty use highly likely. Blue Circle also failed to produce evidence to rebut Weller's denial of marijuana use by showing that the 60 ng/ml level could result only from direct intentional inhalation and could not be caused by passive inhalation while others smoked marijuana in Weller's presence.

In short, while the testing methods are extremely accurate in detecting the presence of even minute quantities of marijuana byproducts in urine, the decision to designate a certain amount as a "positive" result is a subjective one. An employer could deem the urine sample to be "positive" for cannabis at 20, 50, 100 ng/ml, or any other level. Blue Circle has not shown that detection of billionths of a gram of cannabinoid metabolites in urine demonstrates some adverse effect on the employee's work and thus that a positive result is necessarily "connected with the work." Indeed, Blue Circle's own expert witness testified that the test result did not show any impairment of Weller's ability to work.

In this case, there is no evidence of misconduct by Weller other than the "positive" urinalysis. No evidence was presented that Weller's ability to perform his work was ever impaired, or that he ever used drugs or alcohol while on duty, or that he exhibited unusual absenteeism or other ancillary effects of substance abuse.

Other jurisdictions have required direct evidence of impairment of work performance or evidence that the tested level of drugs would affect the employee's on-the-job duties before the employee can be denied unemployment compensation. *See Virginia Employment Comm'n v. Sutphin*, 8 Va.App. 325, 380 S.E.2d 667 (1989); *Blake v. Hercules, Inc.*, 4 Va.App. 270, 356 S.E.2d 453 (1987) (test results alone are not enough to show deliberate violation of a company rule; employer must show impairment); *Independent School Dist. No. 1 of Tulsa County v. Logan*, 789 P.2d 636 (Okl. App.1989) (proof of impairment is required in addition to positive test results for disqualifying misconduct to be found).

We agree with these holdings.

Blue Circle contends these cases are inapposite because these jurisdictions lack a statute similar to A.R.S. § 23–619.01(B)(7) allowing employees to be disqualified from benefits for violating a company rule. Nevertheless, these cases are concerned with both the reasonableness and work-relatedness of a drug-testing rule—the very criteria used by the Arizona Legislature and DES to determine whether violation of a company rule disqualifies the employee from unemployment compensation.

Blue Circle relies on cases from Louisiana and Illinois for the proposition that employees who test positive for drug use may be disqualified from benefits, regardless of actual impairment. In *New Orleans Public Service v. Masaracchia*, 464 So.2d 866 (La.App.1985), the driver of a company mail delivery van was terminated from employment and denied benefits after testing positive for marijuana. Although the employee showed no signs of physical impairment, there was testimony that the employee smoked marijuana in the company van while at work. In contrast, Blue Circle offered no evidence of drug usage

by Weller on the job or on company property.

In *Eugene v. Administrator, Div. of Employment Security*, 525 So.2d 1185 (La. App.1988), the court held that an employee's voluntary exposure to marijuana smoke was a willful disregard of the employer's interests, and therefore the employee was disqualified from benefits. The court decided without explanation that passive inhalation of marijuana that produced no signs of physical impairment was nevertheless "connect[ed] with work" and disqualified the employee from unemployment benefits. Absent any physical effects, we fail to see a substantial connection between a positive drug test and work, and we simply disagree.

Blue Circle also relies on *Overstreet v. Department of Employment Security*, 168 Ill.App.3d 24, 118 Ill.Dec. 730, 522 N.E.2d 185 (1988). The claimant was terminated after he admitted using cocaine while off-duty. In contrast, Mr. Weller denied using marijuana, forcing Blue Circle to discharge its burden of proving misconduct. A.A.C. R6–3–51190(B)(2)(b). The difference in the drugs involved also distinguish *Overstreet* from this case.[5]

Blue Circle nevertheless argues the rule permitting termination is reasonable and work-related because the employee need not create actual harm to the employer for the employee's misconduct to be disqualifying.[6] However, requiring reasonableness and work connection, the Legislature has indicated that merely theoretical effects on the workplace do not justify a denial of benefits. At least a demonstrable, significant potential for harm must exist. *See* A.A.C. R6–3–5145(A)(4).

The employer lacks any evidence that Weller used marijuana on the job. "[G]enerally what a worker does when he is off-duty is of no concern to the employer and the employer has no basis for holding him accountable for his off-duty conduct." A.A.C. R6–3–5185(B). It is only when "off-duty conduct bears such a relationship to his job as to render him unsuitable to continue in his position because of the adverse affect it would have on the employer's operation" that the activity is considered "connected with the work." *Id.* For example, the after-effects of off-duty intoxication manifested on the job (*e.g.*, chronic absenteeism, inefficiency, sleeping on the job) are clearly work-related and warrant denial of benefits. A.R.S. § 23–619.-01(B)(2). However, a positive test result revealing that marijuana of unknown quantity inhaled or ingested at an unknown prior time may reflect only off-duty activity and may be entirely unrelated to work.

Moreover, a rule which infringes without substantial justification on a worker's bodily privacy and personal life is not "reasonable." As A.A.C. R6–3–5185(B) reflects, employers have no legitimate interest in regulating an employee's behavior off-duty unless they can show that such behavior affects the workplace.[7] Because a drug test—specifically marijuana urinalysis—may easily detect consumption which occurred off-duty, the concern that Blue Circle's drug testing program may infringe on an employee's private conduct is a serious one. William F. Adams and Cynthia L. Remmers, *Drugs and Alcohol in the Workplace: Technology, Law and Policy*, 2 SANTA CLARA COMPUTER AND HIGH-TECHNOLOGY L.J. 322 (1986).

Blue Circle nevertheless contends that the reasonableness of an employer's rule

---

5. *Overstreet* involved cocaine, an addictive drug for which the period of detection after use is much shorter than the detection period for marijuana. BEVERLY A. POTTER AND J. SEBASTIAN ORFALI, DRUG TESTING AT WORK, 93, 119 n. 6, 9 (1990). Thus, a positive test result for cocaine more strongly suggests on-the-job impairment or use of this drug while at work.

6. *See Ross v. Arizona Dep't of Economic Sec.*, 171 Ariz. 128, 829 P.2d 318 (App.1991).

7. *See, e.g., Rulon–Miller v. International Business Mach. Corp.*, 162 Cal.App.3d 241, 208 Cal. Rptr. 524 (1984) (rejecting an employer's argument that an employee's personal romantic relationship was interfering with her ability to perform her job); *See also Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983) (holding that off-duty sexual conduct is protected by privacy interest).

may be assessed in part based on the type of the employer's business and other surrounding circumstances. A.A.C. R6–3–51485(A)(2). Blue Circle may insist that its employees obey all health and safety laws relating to the workplace. It may terminate employees who are impaired on the job without incurring increased liability for unemployment compensation contributions.

Nevertheless, an employer may not deny the "safety net" of unemployment benefits to a worker and his family without presenting proof of the reasonableness and job-relatedness of its company rule. If Blue Circle's workplace safety were implicated by off-duty marijuana use, then it could have produced evidence of that fact.

Blue Circle also relies on a generalized public policy against illegal drug use to justify its drug testing rule. *See* A.R.S. § 13–3405 (a person shall not knowingly possess, use, produce or sell marijuana). However, the unemployment compensation system also recognizes as a public policy protection of the off-duty personal lives of employees. *See* A.A.C. R6–3–5185(B). *See also* Ariz. Const. Art. 2 § 8.[8] "The [employer's] rule must be reasonable in light of public policy and should not constitute an infringement upon the recognized rights and privileges of workers as individuals. Rules to affect the employee's conduct outside the employer's premises and which could not reasonably affect the employer's interests are generally considered unreasonable." A.A.C. R6–3–51485(A)(2).

Without requiring evidence that the employer's rule is work-connected, an employer could regulate any aspect of an employee's private conduct that the employer might consider immoral or improper. For example, a company rule banning after-hours use of tobacco or a rule banning cohabitation might promote public policies concerning health or family values. But a company rule that intrudes on employees' private lives requires a demonstrable and substantial work connection, not a theoretical, remote, or insignificant connection. The company rule must reasonably address a real threat to the employer's legitimate business interests without excessive prying into the bodies and private lives of its employees.

To disqualify a worker from the benefits which protect the worker and his family from financial disaster, a company's rule must do more than implement the employer's private views about matters of public policy. *See* A.A.C. R6–3–5145(A)(3). An employer's moral support for a general public policy against drug abuse is not connected with the employee's work. This is the rule in every case of employee misconduct—even when a worker is discharged from employment for an alleged violation of public law. Illegality is disqualifying misconduct only if the employee's conduct is "connected with the work." A.A.C. R6–3–51490.

Finally, Blue Circle argues that "disobedience, by itself, adversely affects the employer's interests." Accepting this argu-

---

**8.** The dissenting opinion complains that Weller never relied on the Arizona Constitution, and also argues that the constitutional provision is inapplicable. (Dissenting Opinion at 230, 860 P.2d at 497). These arguments miss the point of our citation to the constitutional provision. We cite the Constitution and the DES regulation as evidence of Arizona's public policy to protect individual privacy. The dissent does not deny that such a policy exists, specifically in the unemployment benefits context. Moreover, the citations by our dissenting colleague support our point rather than undermine it. In all three cases cited, the United States Supreme Court held that privacy interests protected by the Fourth Amendment to the U.S. Constitution were invaded. In *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the court held that the state could *not* compel a suspect to

undergo surgery to remove a bullet lodged in a suspect's chest. In two drug-testing cases, the court approved drug testing programs. However, in both cases the testing was highly selective (neither universal nor random, as with Blue Circle's policy) and was justified by "compelling" governmental interests in drug interdiction and railroad safety. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The court also relied on the public employees' diminished expectations of privacy based on the nature of their employment. Most importantly, both cases recognized that the employee is protected by a right of privacy against unwarranted or unduly intrusive drug testing.

ment would leave employees' bodies and private lives completely at the mercy of their employers' views of morality and the rules adopted to enforce such views. Blue Circle's argument is directly contrary to the Legislature's protection of Arizona citizens' interest in receiving unemployment benefits and in maintaining their personal privacy.

We hasten to add that we do not leave employers defenseless against drug abuse by their workers. For example, a positive drug test administered after discovery of evidence of erratic behavior, lack of coordination, chronic absenteeism, or other observed signs of actual impairment may suffice to prove both work-relatedness and reasonableness.

Urinalysis is also not the only method of drug testing. Hand-eye coordination tests which focus on on-the-job impairment as opposed to an employee's conduct off the job may help employers draw the line between a reasonable, work-related rule and one which impermissibly regulates the employee's private life. William K. Stevens, *Measuring Workplace Impairment*, N.Y. Times, March 6, 1990, at C1. *See also* GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS 550 (8th ed. 1990) (marijuana impairs coordination). Such tests are commonly administered by police officers for alcohol intoxication and are known as "field sobriety tests." The same or similar tests are effective in detecting marijuana's deleterious effects. *See* GOODMAN & GILMAN'S, *supra* at 551.

Blue Circle and other employers have a legitimate interest in prohibiting employees from working while they are physically or mentally impaired by drugs. Impaired workers are not only a menace to the vitality of our economy but also to the safety of the community and other workers. However, Blue Circle's substance abuse policy did not address impairment. Nor did Blue Circle monitor its employees for signs of impaired performance. Its policy provides for termination based solely on random urine test results set at an arbitrarily low threshold.[9]

Based on the foregoing reasons, we hold that the Appeals Board erroneously denied claimant unemployment benefits. The employer failed to meet its burden of proving that its rule providing for termination based on positive test results, without more, was reasonable and work-related.

Accordingly, the judgment of the Appeals Board is reversed and the award of the Appeal Tribunal is reinstated.

CLABORNE, J., concur.

JACOBSON, Presiding Judge, dissenting:

I must dissent. Contrary to the majority's contention, I do not believe that Blue Circle had the burden to show either that Weller was intoxicated on the job or that his ability to perform was impaired by marijuana use. Although Weller contended he was not guilty of on-the-job intoxication, he was not discharged for intoxication, a misconduct violation covered by A.A.C. R6-3-51270.[10] As that regulation clearly pro-

9. Blue Circle makes the assertion, apparently unsupported by the record, that while its test does not establish intoxication, any intoxicated person taking the test would fail. Scientific evidence is apparently to the contrary. THC metabolites may not immediately appear in urine specimens, and therefore, an employee reporting to work soon after ingesting marijuana might not immediately test positive for marijuana even though the person may be under the influence of the drug. *See* GOODMAN & GILMAN'S, *supra* at 552.

Moreover, the fact that some of those who test positive may be actually impaired does not justify denial of benefits to those who test positive and are unimpaired. If Blue Circle desires to

terminate employees who are impaired on the job because they are intoxicated, as it surely may, then it may direct its supervisors to be observant for the signs of intoxication. The intoxication may then be confirmed by urine testing and/or by a field sobriety test.

10. R6-3-51270 provides, in part:
    A. When a claimant is discharged for ... using illegal drugs at work, or reporting to work ... under the influence of intoxicants, a disregard of the employer's interest may be established.
    B. A discharge for intoxication off the job is not disqualifying *unless it can be shown that a claimant's off-duty intoxication is connected with his work...* (Emphasis added.)

vides, it would have been Blue Circle's burden to show off-duty conduct affected on-duty work. Because Blue Circle did not allege such a violation, its lack of evidence on this point is understandable.

This then brings us to the real issues before both the administrative body and this court: Did Blue Circle show a violation by Weller of a company rule and, if so, is that rule reasonable?

In order to place these legal and factual issues in context, a brief review of the pertinent facts established by the record is in order. Blue Circle is a heavy industry employer that manufactures cement and cement products. Weller was employed as a heavy equipment and truck operator.

In May 1988, Blue Circle adopted a comprehensive substance abuse policy. This policy had two components: (1) rules dealing with on-premise possession of alcohol or drugs, and (2) adoption of a drug and alcohol testing program. The prohibition against on-premise possession of alcohol or drugs was to take effect immediately; violation of this rule could result in termination.

The testing program was not to become effective until approximately thirty days later, on June 15, 1988. Although refusal to take the test or failure to pass the test would result in termination, any employee with a substance abuse problem could avoid termination by notifying Blue Circle and requesting treatment prior to June 15, 1988. All of Blue Circle's employees were informed of the institution of the substance abuse policy and the lead time for testing. Weller signed a statement that he likewise was aware of the policy.

All test results were confirmed by a test known as "gas chromatography/mass spectroscopy test (GC/MS)." An exhibit, which was introduced into evidence, describes this test as follows:

> The most specific and sophisticated technique is a combination of gas chromatography and mass spectroscopy. It is the

most favored as a confirmatory test because of its accuracy and reliability, with an error rate of close to zero. But, at a cost of from $30 to $75 per test, it is also the most expensive.

*Employment Testing: A National Reporter on Polygraph, Drug, AIDS, and Genetic Testing,* p. D:9.

Weller's urine sample was subjected to this confirmatory test, and tested at 60 nanograms of cannabinoids per milliliter.[11] In addition to Weller, 18 other employees tested positive and were terminated. There simply is no issue whether Weller violated a company policy of which he was aware and whether the company policy was uniformly enforced among all Blue Circle employees.

The majority takes the position that, regardless of this factual predicate, the policy must also be "connected with the work" and "reasonable." In concluding that the substance abuse policy is neither connected with the work nor reasonable, the majority assumes that, unless the institution of a drug-free workplace has the probable result of lessening impairment on the job, the rule is neither work-related nor reasonable. Not only is simple logic to the contrary, so are the regulations dealing with misconduct. Unlike a discharge for intoxication, which requires on-the-job effect, misconduct involving a rule violation is not so narrow:

> An employee, discharged for violating a company rule, *generally is considered discharged for misconduct connected with the work.*

> . . . . .

> The rule must be reasonable in light of public policy and should not constitute an infringement upon the recognized rights and privileges of workers as individuals.

A.A.C. R6–3–51485(A) (emphasis added).

Thus, under the regulation, the "connected with the work" requirement is satisfied if the worker violated a company rule that

---

**11.** The majority contends that such a "positive" showing of marijuana is purely subjective. However, no attack was made by the claimant before the administrative agency that this threshold showing was improper.

is reasonable in light of public policy and does not infringe upon recognized rights. Clearly, the public policy of the state of Arizona is against the use of marijuana and, contrary to the majority's position, does not reflect an employer's personal beliefs in morality. The criminal code makes its use, possession, or production under certain circumstances a felony. A.R.S. § 13–3405. The majority misses the point by arguing that private conduct allows illegal activity. No such public policy exists.

The majority, in an effort to counter this policy against illegal activity, points to a supposed counter-prevailing policy embodied in art. 2, § 8 of the Arizona Constitution:

> No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Weller has never in this court or before the administrative body contended that taking a urine sample violated this constitutional provision, which is understandable because it is simply not applicable to Blue Circle's testing policy. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989) (the time it takes to procure a urine sample for testing cannot by itself "infringe significant privacy interests"); *Winston v. Lee*, 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985) (it is "society's judgment" that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity").[12]

Finally, the majority contends that a portion of A.A.C. R6–3–51485(A)(2), dealing with off-duty conduct, is applicable. This regulation provides, in part:

> Rules to affect the employee's conduct outside the employer's premises and which could not reasonably affect the

employer's interests are generally considered unreasonable.

I question whether this regulation is indeed applicable. Blue Circle's policy does not prohibit off-job use of marijuana; it does prohibit coming to the job with marijuana in one's system. The question then becomes whether appearing on the job with marijuana in one's system could reasonably affect Blue Circle's interest. It should be observed that Weller was operating heavy equipment, where the potential for misuse could have disastrous effects. Blue Circle argues that, although its testing policy cannot detect those who are not intoxicated, it certainly can detect those who are. This issue aside, it appears to me that the potential of employees who are marijuana users causing harm to Blue Circle's business is, on its face, a sufficient justification to ask for a drug-free work environment and to at least place the burden on the employee to come forward with evidence that marijuana use and its detection can never show impairment. This Weller did not do. I therefore would find A.A.C. R6–3–51485(A)(2), if applicable, to have been violated.

One final comment needs to be made. The majority seems to contend that Weller's denial of marijuana use, coupled with his lack of a criminal record of drug use, is sufficient to overcome the test result of marijuana in his system or at least make the evidence equally balanced. The weight to be given the evidence in this case is for the Board, not this court. Because refusal to take the test was also grounds for termination, Weller's bravado in subjecting himself to the test is both understandable and a circumstance to be considered by the trier of fact.

I would affirm.

---

12. The majority states those cases support their position, which I will not take the time to dispute. The point is, the issue of invasion of privacy was not raised except by the majority. The majority raises this solely on its own, again without allowing an adversarial confrontation on the issue. Thus, the court has not had the benefit of counsels' input as to whether the majority or the dissent is correct.